**In re Janis Marie ROGERS, Debtor.**

**Bankruptcy No. 86–07941.**

United States Bankruptcy Court,
E.D. Michigan, S.D.

Oct. 28, 1986.

Leonard B. Shulman, Flint, Mich., for debtor.

W. Schuyler Seymour, Flint, Mich., for Credit Union.

Steven W. Moulton, Flint, Mich., for Genesee Merchants Bank and Trust Co.

Douglas M. Philpott, Flint, Mich., for G.M.A.C.

Carl L. Bekofske, Flint, Mich., trustee.

## MEMORANDUM OPINION REGARDING CONFIRMATION OF DEBTOR'S CHAPTER THIRTEEN PLAN

ARTHUR J. SPECTOR, Bankruptcy Judge.

The question is whether the debtor has pledged all of her disposable income over three years into her Chapter 13 plan notwithstanding her insistence on retaining her red 1984 Corvette and paying the entire $17,158.97 secured debt thereon.

The debtor filed her Chapter 13 petition on June 16, 1986. She is an unmarried young woman without dependents, employed by General Motors Corporation, earning average gross wages of $565.00 per week. Her routine living expenses are unremarkable. She has budgeted a reasonable $40.00 per month for recreation. Her plan calls for paying $225.00[1] per week pursuant to wage deductions to the Chapter 13 trustee for four years, a total of $46,800.00 in payments. After accounting for administrative expenses of her attorney and the Chapter 13 trustee (a total of $3,468.00), the balance of the funds collected would be used to make 48 monthly mortgage payments of $324.00 and $198.58 each on her first and second home mortgages respectively ($25,083.84), leaving only $2,213.59 available to pay *pro rata* the $12,668.33 in unsecured claims if all such claims are allowed—a miserly 17 cents on the dollar.[2]

■ Two creditors holding unsecured claims, Genesee Merchants Bank and Trust Company ("Bank") and Flint Service Federal Credit Union ("Credit Union") object to confirmation of the plan on the ground that the plan does not propose to pay their unsecured claims in full and that it does not provide that "all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). They note that the debtor owns two recent vintage automobiles—a 1984 Cavalier, which she values at $4,200.00 and is subject to a $4,707.15 lien held by General Motors Acceptance Corporation ("GMAC") and a

---

1. The Chapter 13 trustee announced at the confirmation hearing that the debtor had volunteered to pay $225.00 per week to the trustee, even though the plan on file and noticed to creditors called for wage deductions and payments to the trustee of only $210.00 per week. The original interim order implementing a $210.00 per week wage assignment was never amended and the plan on file still says that only $210.00 per week, not $225.00 per week, would be paid to the trustee. Nonetheless, the proofs taken assumed the efficacy of the "amendment" and so we will assume the plan proposes payments to the trustee of $225.00 per week.

2. The period in which to timely file proofs of claim expired six days ago. The total unsecured claims filed equals only $7,522.01, yielding a *pro rata* distribution over four years of approximately 29%.

1984 Corvette, which she values at $14,000 and is subject to a $17,158.97 lien held by GMAC. Her plan calls for her to sell the Cavalier and keep the Corvette. Her $180.00 per month payment on the Cavalier, of course, would cease, and GMAC would have a liquidated unsecured claim for a deficiency. By keeping the Corvette, however, her $440.00 per month payment would continue through remittances by the Chapter 13 trustee.[3] The objecting creditors argued that this choice evinces an intent by the debtor to maintain a hot lifestyle at their expense. A plan implementing such an intent, they say, violates § 1325(b)'s requirement that a debtor whose plan does not call for payment in full of all allowed unsecured claims pledge all of her disposable income.

"Disposable income" is defined as "income which is received by the debtor and which is not reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor; or (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation and operation of such business." 11 U.S.C. § 1325(b)(2). (The debtor is not engaged in business so the Court's inquiry is directed solely to that part of the definition contained in § 1325(b)(2)(A)).

The debtor responds that the Bankruptcy Code does not require a debtor to dispose of all of life's little pleasures in order to qualify for Chapter 13 relief; indeed, Chapter 13 is a method for debtors with regular income to pay their debts, while retaining their exempt and non-exempt assets. *See* H.R.Rep. No. 95–595, 95th Cong., 1st Sess. (1977), U.S.Code Cong. & Admin.News 1978, 5787, *reprinted in Collier on Bankruptcy*, 15th ed., Appendix 2, p. 118 (1979) (Chapter 13 ... "permits the debtor to pro-

tect his assets"); *In re Greer*, 60 B.R. 547, 14 B.C.D. 588 (Bankr.C.D.Cal.1986). The debtor notes that had she chosen—or if she chooses—to file Chapter 7 instead of Chapter 13, she would have sufficient exemptions available to her to result in no distribution whatsoever to unsecured creditors, and therefore, their receipt through her Chapter 13 plan of any amount of money is a benefit to them that they should not be allowed to begrudge.

The debtor confuses § 1325(a)(4) with § 1325(b). The former is the best-interests-of-creditors test, which is designed to insure that creditors get no worse treatment through the Chapter 13 plan than they would have received in a straight liquidation under Chapter 7. *See 5 Collier on Bankruptcy*, ¶ 1325.04 (15th ed. 1985); *In re Hardy*, 755 F.2d 75 (6th Cir.1985). The latter was an invention of the 98th Congress in 1984 as part of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Public Law No. 98–353. It is designed to insure that debtors did not get a free ride in Chapter 13. It establishes an ability-to-pay test, which is designed to clarify the "good faith" standard of § 1325(a)(3). *See generally 5 Collier*, ¶ 1325.08; *In re Greer, supra*. Therefore, the fact that a Chapter 7 would yield unsecured creditors less than the proposed Chapter 13 plan is now relevant only as a bargaining chip for debtors when confronting a § 1325(b) objection.

Although retaining a red 1984 Corvette is clearly a lightning rod for criticism, the problem is not the description or even the worth of the asset—it's the size of the debt on it. For example, assume a debtor owns by the entireties with his non-debtor spouse, a resort cottage in northern Michigan, worth an unencumbered $20,000; that the debtor's Chapter 13 plan provides that

---

**3.** Although the creditors argued that the monthly payments of $440.00 to GMAC would continue if the debtor keeps the Corvette, in reality, this is not true. The plan would generate insufficient income to allow the trustee to pay all administrative expenses and home mortgage payments and still have enough to pay a full $440.00 per month to GMAC. Therefore, the

plan would, by operation of the rules of mathematics, if for no other reason, provide that GMAC's claim would be extended to a period of over 41 months of approximately $418.50 per payment in order to pay off the entire $17,-158.97 secured claim. See text for the calculations which led to this determination.

unsecured creditors would be paid 90 cents on the dollar over three years; that the debtor's plan indeed pledged all of the debtor's disposable income over that time period; and that in a Chapter 7 case the debtor would be entitled to exempt the cottage from the estate which would result in a no-asset Chapter 7 case. The creditors' objections to the confirmation of the plan on both § 1325(a)(4) and § 1325(b) grounds would be denied. Obviously, the 90 cents on the dollar the creditors would receive in the Chapter 13 is more than they would receive in the hypothetical Chapter 7, so the best interests test is satisfied. Furthermore, as stated in the premise, all the debtor's disposable income is devoted to the plan; so the ability to pay test is satisfied. Even if the debtor (in conjunction with his wife) *could* sell the cottage and thereby entirely pay off the unsecured debts, the Bankruptcy Code does not require that he do so. Likewise, if the debtor here owned the 'Vette free and clear, so long as the plan called for paying more than the present value of the non-exempt portion of its value to unsecured creditors, the creditors could not insist that she liquidate the asset and pay the proceeds to them. This is so even if, as in the cottage hypothetical, liquidating the car would pay off all the unsecured creditors. Creditors cannot insist on this course of action since the car represents wealth, not income.

In the cottage hypothetical, however, if the debtor owed a $17,000 debt secured by a mortgage on the cottage, payable at $440.00 per month, which his budget showed he intended to continue to pay, or which he proposed to pay through the plan, creditors could be heard to argue that $440.00 per month for a resort cabin is a cost not "reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor". It's the *payment*—not the possession of an asset—which is material in an objection under § 1325(b).

In Flint, Michigan in 1986, the possession and ownership of one vehicle is a necessity. Thus, the debtor's decision to keep one vehicle while disposing of another is reasonable as far as it goes. However, her choice of which vehicle to keep has justifiably resulted in criticism. The question is how much is a reasonable amount to pay for basic transportation during the period of the Chapter 13 plan? This question unavoidably involves the bankruptcy court in difficult value judgments. *See In re Festner,* 54 B.R. 532, 13 B.C.D. 941 (Bankr. E.D.N.C.1985); *In re Jones,* 55 B.R. 462, 13 B.C.D. 1116 (Bankr.D.Minn.1985). It's an unpleasant job, but someone has to do it. The parties, including the debtor, agree that the "someone" is the bankruptcy judge.

The debtor budgets $17,158.97 (the balance due on the Corvette) for four years for the purpose of providing her basic need for transportation. The Credit Union and the Bank[4] maintained that basic transportation should not cost a debtor in similar circumstances so much; basic transportation, they say, can be obtained for far less than the $17,158.97 budgeted. The creditors didn't offer any evidence or even a suggestion on how much is a "reasonable" amount; all parties seem to believe, however, that this is a decision we should make on our own without evidentiary support. Although we are uncomfortable in ruling on so fact-specific an issue with no facts of record and would welcome a reversal on this ground, we feel that the parties' expectation that a bankruptcy judge rule in Chapter 13 cases without benefit of evidentiary record has some support in this circuit. *See Memphis Bank & Trust Co. v. Whitman,* 692 F.2d 427, 431 (6th Cir.1982). Given the current end-of-model-year discounts on American-made cars, we "feel" (for whatever that is worth) that a total of payments over four years for a new (let alone a two-year old) domestic vehicle for

---

**4.** Although GMAC stands to gain as the secured creditor who would receive the payments on the Corvette through the Chapter 13 plan, it vigorously supported the objections of the Bank and the Credit Union at the confirmation hearing. It had standing to so argue as a contingent unsecured creditor since it expected a deficiency from the disposition of the Cavalier.

basic transportation purposes should not exceed $10,000. Thus, the $17,158.97 which the debtor budgets for such purposes is actually made up of only $10,000 for transportation and $7,158.97, or $149.15 per month, for luxury purposes: call it "recreation". When added to the $40.00 per month recreation allotment already in the debtor's budget, it becomes clear that the debtor is pampering her own psyche at the expense of her unsecured creditors. Even if it means that she will convert the case to Chapter 7 and the unsecured creditors get nothing, the objections of these unsecured creditors must be sustained and the plan denied confirmation. *In re Festner*, 54 B.R. at 534.

The Credit Union also objects to the confirmation of the plan on the ground that § 1322(c) provides that "the plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period...." In this case, the debtor offers no explanation as to why the plan should be allowed to continue beyond the normal three-year term. Therefore, the Credit Union correctly argues that cause has not been shown. It also alleges that the debtor had an ulterior motive for the proposed extension to four years. It claims that if the plan were for a period of only three years, there would be no money available whatsoever for unsecured creditors; thus the four-year plan is meant to lull unsecured creditors and the Court into thinking that the debtor is making her best efforts to pay. In essence, it argues that the debtor is merely buying a moratorium so that she can pay off her Corvette.

Our calculation of the mathematics bears out this contention. If the debtor paid $225.00 per week for 156 weeks (three years), she will have paid to the trustee $35,100.00. In addition, at the time of the confirmation hearing, the trustee had already collected $1,124.40 from the debtor, yielding a net total paid into the plan at the end of three years of $36,224.40. The trustee at this court location takes only 6% of the gross receipts toward his fees and expenses, leaving $34,050.94 available for others. The debtor's attorney has unpaid fees which would be allowed as an administrative expense of this estate in the amount of $660.00, which also must be deducted, leaving $33,390.94 available to pay to other creditors. Since the monthly payments on the mortgages total $522.58, 38 months of such payments (2 months prior to the confirmation hearing and 36 months thereafter) would reduce the estate by $19,858.04, leaving available $13,532.90; $440.00 per month paid for 38 months (2 months prior to the confirmation and 36 months thereafter) would require $16,720.00 (which itself is insufficient, obviously, to pay off a $17,158.97 debt). However, by the end of the 36 months, the estate would only have $13,532.90 to pay it, thus building in a post-petition default on the car payments to GMAC. The debtor would have to extend the plan five months at the end of the 36 month period to deal with the default due to GMAC. Obviously, nothing is budgeted in on a three-year plan to pay unsecured creditors. Thus, in order to give the illusion that unsecured creditors would be paid at all, it was necessary for the debtor to propose to extend the plan to something beyond three years. In this case unsecured creditors would not see their first dime until 42 months after the plan is confirmed. Why the debtor chose that the plan last four years instead of five years is the debtor's own business, but it certainly does not support a finding of good faith, when the result is that six months after the unsecured creditors start to get their long delayed payments, the spigot is turned off. Such a plan does not impress the Court. Thus, as an alternative ground, we also find that the plan was not offered in good faith as required by § 1325(a)(3).

For these reasons, the Bank's and Credit Union's objections to confirmation of the plan will be sustained and an order denying confirmation of the plan will be entered.