**In re Manuel Guadalupe
REYES, Debtor.**

**Bankruptcy No. 89 B 30302.**

United States Bankruptcy Court,
N.D. Illinois, W.D.

July 25, 1989.

William M. Flaherty, Atty., Rockford, Ill., for debtor.

Paul S. Godlewski, Atty., Rockford, Ill., for objector.

## MEMORANDUM OPINION AND ORDER

RICHARD N. DeGUNTHER, Bankruptcy Judge.

This matter comes before the Court on an Objection to Confirmation, filed by General Finance Corporation (General).

This Memorandum Opinion and Order shall represent findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## BACKGROUND

The Debtor is a tool and die machinist at Elco Industries and has been employed there for over five years. Although earning a comfortable income for a single person without dependants, the Debtor managed to accumulate over $19,000 in unsecured debt. A portion of the unsecured debt resulted from deficiencies owed after secured creditors repossessed two of the Debtor's vehicles; first a van, leaving a deficiency of approximately $1,066, and then, in 1988, a car, leaving a deficiency of approximately $3,130.

Shortly after the second automobile was repossessed, and even though he was liable for the indebtedness listed above, the Debtor purchased a 1988 Chevrolet Blazer through the Elco Credit Union for over $19,300.[1] The payment schedule was established at $472.00 per month, to be taken from the Debtor's earnings directly. The Debtor testified that the reason for purchasing the Blazer was because he wanted a four wheel drive vehicle. He also testified that his financial condition tightened after the purchase.

Not surprisingly, the Debtor filed a Petition pursuant to Chapter 13 of the Code, on February 28, 1989. The Schedules listed total secured debt of $22,132, including the debt secured by the Blazer and a debt secured by furniture and a camcorder. Total unsecured debt, including the $2,160 owed to General, was listed at $19,575. Current gross income was stated to be approximately $25,000 per year. The Debtor's Budget projected that after deducting monthly expenses, including $120 for recreation, $120 for transportation, and $300 for food, $700 per month would be left over for funding the Plan.

The Debtor's Chapter 13 Plan provides for the distribution to creditors of $660 per month as follows: Payment in full of the costs of administration, priority claims, secured claims, and an unsecured claim representing a loan cosigned by the Debtor's father; payment of 10% of the remaining unsecured claims. The 10% payment on the unsecured debt over the term of the Plan works out to approximately $2,000 in total. It appears that if the Blazer payment was reduced by ⅓, enough funds would be left over to pay unsecured creditors roughly three times the amount that is currently proposed over the term of the Plan.

On April 19, 1989, General filed an Objection to Confirmation, alleging that the Debtor's Plan was not proposed in good faith in that the sole purpose of filing was to retain the recently purchased Blazer and to make only nominal payments to the unsecured creditors. General also alleged that the Debtor had not provided for all of his disposable income to be paid to the Trustee for distribution. At the hearing on confirmation, the Debtor alleged that the Plan should be confirmed because the Debtor could have filed a Chapter 7 case, reaffirmed the Blazer debt, and paid nothing to unsecured creditors. The Court then took the matter under advisement.

## DISCUSSION

The confirmation requirements of Chapter 13 are set out in Section 1325 of the Bankruptcy Code. General brings into

---

1. As of the date of the petition, the balance on the loan from the Elco Credit Union was $19,300.

question two of these requirements: whether the Debtor's Plan was proposed in good faith, as required by Section 1325(a)(3); and whether the Plan provides for the application of all the Debtor's disposable income to fund the Plan, as required by Section 1325(b).

Section 1325(a)(3) provides:

> (3) the plan has been proposed in good faith and not by any means forbidden by law;

Section 1325(b)(1) provides in relevant part:

> (b)(1) If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—

> (B) the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan.

Disposable income is defined in Section 1325(b)(2):

> (2) For purposes of this subsection, "disposable income" means income which is received by the debtor and which is not reasonably necessary to be expended—

> (A) for the maintenance or support of the debtor or a dependent of the debtor;

■ A debtor's failure to meet the disposable income requirement of Section 1325(b) does not require the finding that the debtor did not propose the plan in good faith pursuant to Section 1325(a)(3). *See In re Sutliff*, 79 B.R. 151 (Bankr.N.D.N.Y. 1987). The two are distinct and separate requirements of confirmation. Good faith is determined under the totality of the circumstances, *In re Smith*, 848 F.2d 813 (7th Cir.1988), while the disposable income requirement turns only on whether the debtor's budgeted expenses are reasonably necessary. Moreover, unlike Section 1325(a)(3), the plain language of Section 1325(b) precludes the Court from raising the disposable income issue sua sponte. Only an unsecured creditor or the Chapter Trustee may do so.

■ In the present case, General has not established that the Debtor's Plan was not proposed in good faith. The purchase of a new vehicle, and reliance upon Chapter 13 when the payments cannot be made, indicates an indifference to ones obligations, but does not, standing alone, rise to the level of bad faith. Under the totality of the circumstances, the Court finds that Section 1325(a)(3) has been met here.

See, however, the article, copy attached, by Bankruptcy Judge Judith A. Boulden. Judge Boulden perceives the debtor's commitment to make the necessary sacrifices to carry through the plan as an element of both good faith and feasibility even where the technical requirements have been met. And this Court would hardly disagree.

■ The Debtor's proposal to continue his indifference, or lack of commitment, to creditors through a Chapter 13 does, however, violate the disposable income requirement. The proper analysis for determining whether the debtor has deducted from income only those expenses that are "reasonably necessary," and has therefore provided all the debtor's disposable income to fund the plan, has been addressed frequently by the courts.

Several courts have interpreted the reasonably necessary standard to include only those expenses for basic needs not related to the debtor's former status in society or lifestyle to which he is accustomed. *See In re Kitson*, 65 B.R. 615 (Bankr.E.D.N.C. 1986); *In re Bien*, 95 B.R. 281 (Bankr.D. Conn.1989); *In re Hedges*, 68 B.R. 18 (Bankr.E.D.Va.1986); *In re Rogers*, 65 B.R. 1018 (Bankr.E.D.Mich.1986). A leading commentator espouses the view that the reasonably necessary standard should only exclude luxury items and obvious indulgences. *See* 5 Collier on Bankruptcy, para. 1325.08 (15th Ed.1988). It appears that a bright line rule of what is reasonably necessary has not been established by the courts.

In the present case, the Debtor's Chapter 13 Plan fails the disposable income requirement no matter what view of the reasonably necessary standard is applied. The Blazer is an "obvious indulgence" if ever

there was one. The Debtor did not purchase the four wheel drive Blazer to provide a reliable means of transportation to work, for he lived three miles from work and presumably near paved roadways. Nor did he purchase the Blazer as a requirement of, or to be used for work, as the Blazer is of the "recreational" variety. The Debtor purchased the Blazer simply because he wanted to drive an extravagant four wheel drive vehicle.

■ The Court agrees with General that a new car can be purchased for half of what the Debtor paid for the Blazer, and reliable used cars for even half of that. Several courts have found that such inflated amounts for transportation are not reasonably necessary under Section 1325(b). *See In re Rogers,* supra; and *In re Chrzanowski,* 70 B.R. 447 (Bankr.D.Del.1987). These courts have recognized, as the Court does here, that Chapter 13 debtors should not be able to continue the extravagances which put them into bankruptcy, while their unsecured creditors go unpaid.

The Court finds, therefore, that the payments on the Blazer are not reasonably necessary for the Debtor's maintenance or support.

General also questioned whether the expenses set out in the Debtor's budget represented reasonably necessary expenditures. The Court will typically not impose its judgment as to the necessity of every expense listed on a debtor's Chapter 13 budget. In addition, some leeway in budgeting is required in order to meet the feasibility requirement of Section 1325(a)(5) of the Code.

■ However, when, as here, the budgeted expenses are overly excessive and inflated, and an objection is raised by an unsecured creditor, the Court must review the budget to determine whether Section 1325(b) has been met. *In re Sutliff,* supra. The Debtor's budget indicates inflated monthly expenses of $120 for recreation, $120 for transportation and $300 for food. Considering these amounts in light of the fact that the Debtor has proposed to contribute only $660 of the $700 in monthly income remaining after deduction of expenses, the Court must find that the disposable income requirement would not be met even if the payments on the Blazer did not exist.

The Debtor's argument that the creditors will receive more than in a Chapter 7 case is misplaced. It is true that Section 1325(a)(4) requires creditors to receive under a Chapter 13 plan not less than what they would have received if the estate were liquidated under Chapter 7. 11 U.S.C. Section 305(a)(1). The "best interests of creditors" requirement is one important hurdle the Debtor must jump in order to achieve confirmation.

However, the Debtor may not ignore another provision of Section 1325 that becomes a requirement once properly raised, the disposable income requirement of Section 1325(b)(1). Congress added this subsection to Section 1325, pursuant to the Bankruptcy Amendments and Federal Judgeship Act of 1984, in response to the divergence of opinion among the courts as to the minimum level of payment necessary to meet the good faith requirement of Section 1325(a)(3). The disposable income requirement was intended to be in addition to, and not an alternative for, the best interests of creditors requirement of Section 1325(a)(4). *See In re Willingham,* 83 B.R. 552 (Bankr.S.D.Ill.1988); *In re Fries,* 68 B.R. 676 (Bankr.E.D.Pa.1986); and *In re Rogers,* supra. Hence, it is misplaced to argue that the Plan should be confirmed because one, although not all, of the requirements of confirmation have been met.

\*　　\*　　\*　　\*　　\*　　\*

In addition, the Debtor's argument ignores Section 707(b) of the Bankruptcy Code. Were the Debtor to file a Chapter 7, he would have to survive the substantial abuse analysis of Section 707(b). Indeed, in many respects the substantial abuse provisions of Chapter 7 limit the debtor's free rein in treatment of its creditors, much as the reasonably necessary provision does in Chapter 13. A primary factor which may indicate substantial abuse is the ability of the debtor to repay debts out of future income. *See In re Peluso,* 72 B.R. 732

(Bankr.N.D.N.Y.1987); *In re Struggs*, 71 B.R. 96 (Bankr.E.D.Mich.1987); *In re Kitson*, supra. Hence, the Debtor's "big stick" argument that "I could have filed a Chapter 7 and given unsecured creditors nothing," is not as big as the Debtor would or should make it out to be.

\*   \*   \*   \*   \*   \*

The Debtor's Chapter 13 Plan does not propose to pay all the Debtor's disposable income to fund the Plan and should not be confirmed. Although it is not in the public interest to squeeze the last dollar out of Chapter 13 debtors to fund Chapter 13 plans, *In re Otero*, 48 B.R. 704 (Bankr.E.D. Va.1985), a Chapter 13 debtor cannot expect to go "first class when coach is available." *In re Kitson*, supra.

The Debtor's attempt to retain an expensive new vehicle simply because he wants it, while proposing to pay unsecured creditors 10% of their claims is particularly disturbing to the Court. During his testimony, in response to a question put to him by the Court, the Debtor stated that he had fully disclosed his dismal financial history to Elco Credit Union, and they had, in the face of it, approved his request for the Blazer loan.

Chapter 13 was intended to give debtors a chance to repay debts, which may require some sacrifices by the debtor. It was not intended to be used as a tool for facilitating a debtor's already excessive and over-indulgent lifestyle. Consequently the Debtor's Chapter 13 Plan cannot be confirmed.

## CONCLUSION

Therefore, based on the foregoing, the Court concludes:

(1) confirmation of the Debtor's Chapter 13 Plan should be denied; and

(2) the case should be dismissed, effective August 8, 1989, without further Order, unless the Debtor files, prior thereto, an Amended Plan which meets the confirmation requirements of Chapter 13.

IT IS SO ORDERED.

## APPENDIX
### From the Bench
*By the Honorable Judith A. Boulden*

*United States Bankruptcy Judge for the District of Utah. Member, National Conference of Bankruptcy Judges, Chapter 13 Trustees' Liaison Committee.*

*Judge Boulden graduated from law school in 1974 and served a federal judicial clerkship. She was associated with two law firms specializing in corporate reorganizations and thereafter established her own firm which concentrated on debtor and trustee representation.*

*Prior to assuming the bench in January of 1988, Judge Boulden was Standing Chapter 13 Trustee for nine years, as well as a Chapter 7 Trustee. From an initial caseload of 40 cases, her Chapter 13 caseload increased to over 3,500 active cases. Total annual disbursements exceeded $5,000,000 prior to assuming the bench.*

Any comments I have regarding the extraordinary success of Chapter 13 and the vital role of Standing Trustees as the engineers of that success, may seem like preaching to the already baptized. No group recognizes the effectiveness of this chapter as does this readership. No harm is done, however, in acknowledging in print the contribution of this chapter and of Standing Trustees, to the rehabilitation of a multitude of individuals.

Participants in the bankruptcy system not familiar with the Chapter 13 process, including some members of the bench, could well do with a reminder of the importance of this chapter. Perhaps because of its very success, this chapter does not attract the popular press as some Chapter 11 filings do. No headlines appear detailing the economic and psychological impact of the millions of dollars returned each year to creditors by honest debtors working their way toward economic recovery.

I fear that attitude is sometimes shared by the bench and bar. At a recent multi-circuit judicial conference, the closing speakers reviewed the strengths and weaknesses of the last 10 years under the Code. Chapter 11 was the exclusive success topic.

No mention whatsoever was made of Chapter 13.

I contend that Chapter 13 is the single most successful provision of the 1989 Bankruptcy Reform Act. The chapter has benefitted untold debtors by allowing them to retain their property and their dignity. Further, the co-equal goal of the Code of repaying creditors has been extremely successful in this chapter, both in terms of expeditious payment and numbers of claims satisfied.

The success of Chapter 13 encompasses a value to the system that is larger than the sum total of the successful Chapter 13's that have been confirmed and consummated. That value is in establishing and maintaining the credibility of the Chapter 13 system. That credibility generates creditor confidence that Chapter 13's are successful, will fairly repay money to them, can be counted upon to be administered promptly and equitably, and provide the positive rehabilitation desired in bankruptcy. If the credibility of the Chapter 13 system generates creditor cooperation and encouragement, debtors will find their plans more economically and expeditiously confirmed, thus enabling debtors to receive their discharges sooner.

In order to maintain this successful system and its reputation among creditors as an efficient, fair method of repayment, it is incumbent upon all those participating in the system to ensure that the spirit of the chapter is preserved. I believe that the integrity and credibility of the system is dependent in large upon Chapter 13 debtors consummating plans which repay the maximum amount possible to creditors.

Let me propose a philosophical approach which perhaps places the good of the system over the needs of any particular debtor. I do not believe that Chapter 13 was intended for every debtor who can possibly qualify under the minimum standards of the statute. I have observed, with some dismay, a new trend. That is the attempt on the part of some attorneys to obtain relief under Chapter 13 for debtors who, though perhaps nominally qualified, do not propose a meaningful repayment to creditors, whose chances of consummating a plan are speculative at best, and who evidence the rather cavalier attitude that if a Chapter 13 doesn't work, they can always convert to a Chapter 7.

I believe Chapter 13 was intended for a relatively select group of individuals. Congress has narrowed the availability of this chapter and already statutorily discriminated among debtors in setting forth both the eligibility requirements and the standards of confirmation of a plan. But, satisfaction of those qualifications alone doesn't necessarily ensure consummation of a plan. To really make a plan a success once confirmed, the Chapter 13 debtor must have a character trait which Congress cannot define. It is a function of both good faith and feasibility, and constitutes the debtor's commitment and desire to repay creditors over an extended period of time. Without that commitment, the nature and amount of the resources available to fund a plan are relatively immaterial. Even a plan proposing a 100% return is of no benefit to the parties involved or to the system if the debtor does not make the commitment to fulfill the obligation set forth in the plan.

Although the court may find a plan feasible and proposed in good faith as of the date of confirmation, the analysis must go one step further to determine if the debtor has the commitment necessary to consummate the plan. Feasibility is too often looked upon as only a function of the debtor's ability to fund a plan in the future. It is much more. It is the willingness of the debtor to modify an existing lifestyle, whether through supplemental employment or reduced expenditures, over an extended period of time. Those debtors lacking the commitment to make the necessary sacrifices to carry through with the plan, should not have their plans confirmed. If they are, it is only to the detriment of those individuals committing all available resources, as well as a determination to repay the maximum possible to creditors.

There is no benefit to the system as a whole to confirm a plan because it technically complies with 11 U.S.C. § 1325,

though there may be doubt as to whether the debtor has the commitment to consummate the plan. The warning signs, preconfirmation, of a lack of commitment are debtors who are tardy on their interim payments, who attempt to retain unnecessary assets or who propose budgets with a substantial "slop factor". It is tempting to confirm a plan which would give one last chance to save the debtor's home, car or other personal effects. But a plan should not be confirmed when it is apparent that the sole intent of the debtor is to retain assets, not to repay creditors.

I submit that in confirming a plan consideration must be given, not only to the individual circumstances of the debtor but to the integrity of the Chapter 13 evident to this point, cannot be maintained if the benefit of the doubt is consistently given to debtors with questionable plans, ability or commitment to this system to repay creditors. Those cases often end in conversion or dismissal. When that happens, it only serves to undermine the confidence that creditors have in the system. Repetitive filings, low repayment plans, attempts to retain expensive consumer items, or liberal budgets, only to serve destroy the credibility of Chapter 13 as an equitable means of repayment and rehabilitation.

This attitude is not unduly harsh or exclusivist. The statute still retains alternatives for individuals without the resources, capability or commitment to repay creditors. They have a remedy. I maintain, merely, that the remedy is not in filing a chapter 13 with the anticipation that if it isn't as easy as originally envisioned, one can always convert. A fresh start is, of course coupled with fair treatment of creditors and is available only for the honest debtor. Anything less injures the spirit and intent of the statute to the detriment of those honest debtors who may seek relief in the future.