**In the Matter of Carvey (NMN) JONES Debtor.**

**Bankruptcy No. 89–11482.**

United States Bankruptcy Court,
N.D. Indiana,
Fort Wayne Division.

Sept. 26, 1990.

Rebecca Harper, Marion, Ind., for debtor.

Donald M. Aikman, Trustee, Fort Wayne, Ind.

Charles J. Riley, Marion, Ind., for creditor.

## DECISION

ROBERT E. GRANT, Bankruptcy Judge.

This matter is before the court on the objection of Citizen's National Bank to confirmation of debtor's proposed Chapter 13 plan and its motion for relief from stay.

### I. Facts

The Debtor, Carvey Jones, purchased a 1989 Cadillac Brougham on March 31, 1989. To do so, he borrowed $31,855.62 from Citizen's National Bank (CNB). The loan was to be repaid, with interest at the rate of 13.25 percent, over a period of five years through monthly payments of $732.92. This financing was arranged through the dealership where he purchased the vehicle. Before approaching CNB about the loan, the dealership first submitted a loan application to General Motors Acceptance Corporation which declined the opportunity. The application was then submitted to CNB. In it the debtor failed to list some outstanding debts. CNB approved the loan.

Based largely upon the substantial obligation represented by the car loan, debtor soon encountered financial difficulties. He failed to make the payments required on account of the Cadillac and CNB apparently filed suit in state court on September 14, 1989. Mr. Jones sought relief under Chapter 13 of the Bankruptcy Code on October 10, 1989. His bankruptcy schedules list a total indebtedness of $44,000.00, approximately $32,500.00 of which was owed to CNB for the Cadillac.[1]

The debtor's proposed plan provides for payments to the Chapter 13 trustee of $180.00 per week, for a period of thirty-six months. In addition to these payments, the Trustee is also to receive the amount by which the total of debtor's state and federal tax refunds exceeds $500.00 for the

---

**1.** The proof of claim filed by Citizens National Bank places the amount due it on the date of the petition at $33,217.14. Unsecured claims

tax years 1989–1991.[2] From these payments, the trustee is to pay CNB's secured claim on account of the Cadillac, which the plan places at $19,000.00, with interest at the rate of 10 percent. The remaining amounts due it are to be treated as an unsecured claim. Once the secured claim has been fully paid, payments are to be made on account of any claims entitled to priority under § 507.[3] After full payment of CNB's secured and any priority claims, the trustee is to begin making payments on account of unsecured claims. Debtor's only other creditors, the contract seller of his residence and the recipients of court ordered support, are to be paid directly by Mr. Jones.

Pursuant to the court's order of March 2, 1990, the trustee made an adequate protection payment to CNB of $1,176.00. Monthly adequate protection payments of $392.00 began on February 2, 1990 and are to continue until confirmation.

## II. Confirmation of the Proposed Plan

Debtor bears the burden of proving that its proposed plan satisfies the requirements for confirmation. CNB raises three objections to the plan. It claims that:

A. The plan does not provide for a distribution, as of the effective date of the plan, equal to the full value or amount of its secured claim, as required by 11 U.S.C. § 1325(a)(5)(B)(ii);

B. The debtor has failed to dedicate all of his disposable income to making the payments called for by the plan, as required by 11 U.S.C. § 1325(b); and

C. The plan has not been proposed in good faith, as required by 11 U.S.C. § 1325(a)(3).

### CNB's Secured Claim

The first basis for CNB's objection to confirmation, is that the plan does not properly provide for the payment of its secured claim. CNB contends that the plan under-

values the vehicle securing payment of its claim and that the plan's proposed rate of interest is too low. Debtor has agreed to file an amended plan to reflect payment of the 12.34% interest rate CNB contends is appropriate. This disposes of any issue concerning the proper rate of interest.

The remaining aspect of the dispute concerning the proper treatment of CNB's secured claim involves the value of the Cadillac upon which it holds a perfected lien. The court, after careful consideration of all the testimony, finds that the value of this car in its present condition is $21,800.00. In making this determination, the court has considered the evidence and testimony presented by both sides, the credibility, experience and qualifications of the experts who testified, the basis for their opinions and the information available to them, their appraisal methods and opportunities for observation.

Debtor's proposed plan, which values the vehicle at $19,000.00, cannot be confirmed. The plan fails to comply with § 1325(a)(5)(B)(ii).

### Disposable Income

CNB advances its second objection to confirmation based upon its status as an unsecured creditor, as defined by § 506(a). The court cannot confirm a Chapter 13 plan over the objection of an unsecured creditor unless unsecured claims are to be paid in full or,

the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan. 11 U.S.C. § 1325(b)(1)(B).

For the purposes of this confirmation requirement, "disposable income" represents that part of the debtor's income "which is not reasonably necessary to be expended for the maintenance or support of the debt-

---

totaling $15,220.79 have been filed by other creditors.

**2.** Debtor's 1989 tax refunds, received in 1990, totaled $3,685.00.

**3.** It does not seem that debtor has any priority claims.

or or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(A).

Congress created the disposable income test of § 1325(b) as part of the 1984 amendments to the Bankruptcy Code. It operates as a fail safe mechanism to assure a degree of uniformity in the effort to repay creditors which will be required of a debtor. *Matter of Hale,* 65 B.R. 893, 896 (Bankr.S. D.Ga.1986). Prior to the amendment, so long as the best interests test of § 1325(a)(4) was satisfied, there was no statutory requirement that a debtor dedicate any particular portion of its income to a Chapter 13 plan or that the plan extend for a particular amount of time. *See* Omnibus Bankruptcy Improvements Act of 1983, S.Rep. No. 65 98th Cong. 1st Sess. 20 (1983).

The disposable income test represents the Congressional response to the disparate treatment that zero or minimal payment plans received at confirmation. *See* Personal Bankruptcy, Oversight Hearings before the Subcommittee on Monopolies and Commercial Law of the Committee on the Judiciary House of Representatives, 97th Cong., 1st and 2nd Sess. 223 (1981–82). One variation of these plans would specifically provide for no payments on account of unsecured claims or small, almost meaningless, payments after confirmation. Alternatively, the size of a dividend to unsecured creditors was a function of the debtor's financial circumstances and the available income from which plan payments could be made. Because unsecured creditors would have received nothing under Chapter 7, these plans satisfied the best interests test of § 1325(a)(4) by giving them at least as much as they would receive upon liquidation. Whether or not such a plan could be confirmed often turned upon the question of good faith and the court's views concerning the degree of effort or the return to creditors that good faith might require. *Compare In re Raburn,* 4 B.R. 624 (Bankr.M.D.Ga.1980) (good faith requires substantial payment to unsecured creditors, 70% or more, and a debtor's best efforts) with *In re Cloutier,* 3 B.R. 584 (Bankr.D.Col.1980) (good faith

does not require distribution to unsecured creditors).

Where confirmation was denied, both debtors and creditors might be deprived of the benefits of Chapter 13, without regard to a debtor's sincerity, simply because the debtor's circumstances did not permit it to do more. Conversely, if such plans were confirmed, some debtors were able to obtain the significant benefits of Chapter 13, while simultaneously denying unsecured creditors the benefits they were theoretically supposed to receive, an increased distribution on account of their claims. This remained true even though the debtor might have enjoyed a comfortable income and, had it chose to do so, could have proposed a plan which would have produced a substantial dividend for unsecured creditors, if not paying them in full, without any reduction in the debtor's lifestyle or standard of living. *Cf. In re Long,* 10 B.R. 880 (D.S.D.1981) (reversing confirmation of debtors' plan which paid $20.00 bimonthly toward unsecured claims where debtors had an average bi-monthly budget surplus of $1,000). The disposable income test minimizes the conflict illustrated by these two extremes. Through it, Congress has created the standard which measures the extent of the financial commitment that can be demanded from a Chapter 13 debtor beyond the threshold mandated by the best interests test.

When considered against this historical background, it becomes apparent that CNB's complaint does not fit within the traditional concept of a disposable income objection. CNB does not contend that the debtor is not dedicating enough money to funding the plan or to the payment of claims under the plan or that debtor has additional funds which could be paid to creditors. Indeed, debtor's commitment of $180.00 per week for thirty-six months, plus tax refunds, would seem to be substantial. Instead, the creditor's complaints lie with the plan's provisions concerning how the trustee is to distribute these funds. What angers this creditor is the debtor's attempt to use Chapter 13 as a means to retain the Cadillac and the high proportion of funds the trustee will be re-

quired to distribute on account of the claim it secures.[4] CNB argues that the court should require the debtor to surrender the Cadillac and acquire a less expensive vehicle. This would result in all, or at least most, of the money which would otherwise be used to pay for the Cadillac to be distributed on account of unsecured claims.

CNB's position is not without support. The Bankruptcy Court for the Northern District of Illinois recently confronted a similar scenario with respect to payments on a Chevrolet Blazer. *See In re Reyes*, 106 B.R. 155 (Bankr.N.D.Ill.1989). *See also In re Rogers*, 65 B.R. 1018 (Bankr.E.D.Mich.1986) (involving a red Corvette); *In re Hedges*, 68 B.R. 18 (Bankr.E.D.Va.1986) (involving a boat). In denying confirmation of the debtor's Chapter 13 plan, the Illinois court concluded:

> Debtor's Chapter 13 Plan fails the disposable income requirement.... The Blazer is an 'obvious indulgence' if ever there was one. The Debtor did not purchase the four wheel drive Blazer to provide a reliable means of transportation to work, for he lived three miles from work and presumably near paved roadways. Nor did he purchase the Blazer as a requirement of, or to be used for work, as the Blazer is of the 'recreational' variety. The Debtor purchased the Blazer simply because he wanted to drive an extravagant four wheel drive vehicle. *Reyes*, 106 B.R. at 157–158.

This court shares the concerns which persuaded these courts to find that payments on such indulgences were not reasonably necessary for the debtor's maintenance or support. *Reyes*, 106 B.R. at 158; *Rogers*, 65 B.R. at 1020–1021; *Hedges*, 68 B.R. at 20–21. A Chapter 13 debtor who is not able to pay its creditors in full is generally expected to demonstrate a degree of belt tightening and this may require some sacrifices. *See In re Jones*, 55

B.R. 462, 465 (Bankr.D.Minn.1985). It should not continue the same type of lifestyle that produced the need to seek bankruptcy relief. *Reyes*, 106 B.R. at 158. Nonetheless, we disagree with their conclusions that confirmation should have been denied based upon a violation of the disposable income test of § 1325(b)(1)(B). Rather than analyzing this type of issue in the context of disposable income, it is more appropriately considered as part of the good faith inquiry required by § 1325(a)(3).

Section 1325(b)(1)(B) requires a Chapter 13 debtor to dedicate all of its projected disposable income "to make payments under the plan." It does not require disposable income to be committed to the payment of unsecured claims under the plan—only to the plan's payments in general. On its face, this portion of the Bankruptcy Code is not concerned with the payments that are being made to pre-petition creditors whose claims are provided for or being satisfied in accordance with the terms of a proposed plan. Such payments, whether distributed by the trustee or directly by the debtor, are payments under the plan. *Contra Hedges*, 68 B.R. at 21; *See also* Lundin, 1 *Chapter 13 Bankruptcy* § 5.30 at 5–71 (Legal, 1990).

What § 1325(b) is attempting to address are the eternally recurring expenses that confront everyone who lives in twentieth century America. These expenses represent the myriad of different obligations which must be paid in order to keep a roof over your head, food on the table and a shirt on your back. They are, perhaps, more easily understood as being the ongoing living expenses of a debtor and its family. By limiting them to the expenses that are "reasonably necessary ... for the maintenance or support of the debtor or a dependent of the debtor" and requiring that all other income be committed to the payment of pre-petition creditors under the

---

4. Without considering any effect the pre-confirmation adequate protection payments might have on the amount of CNB's secured claim, based upon the court's valuation of the vehicle and the (now agreed upon) 12.34% interest rate, it would require 37.6 months using the net amount of debtor's entire monthly payment into

the plan, after payment of the trustee's commission, to satisfy the claim secured by this vehicle. Thus, it would seem that it is only through the inclusion of debtor's income tax refunds that the plan becomes feasible at its current level of funding.

plan, § 1325(b) allows a debtor to maintain a reasonable lifestyle while simultaneously insuring that it makes a serious effort to fulfill its obligations to creditors, by eliminating unnecessary or unreasonable expenses. *See Jones*, 55 B.R. at 466. If a debtor is not willing to make this type of commitment, it must either forgo bankruptcy relief or, subject to the limitations of § 707(b), seek relief under Chapter 7.

These considerations take on a somewhat different complexion, however, when the expense or payment being challenged is not part of the debtor's post-petition lifestyle but is, instead, a pre-petition debt the debtor is attempting to satisfy in accordance with the requirements governing confirmation of a Chapter 13 plan. A major purpose of Chapter 13 was to create a vehicle through which a debtor would be allowed to retain its assets, by developing a plan that would repay both its secured and unsecured creditors over time. Section 1325(b) was not enacted to discriminate between debtors whose financial problems arose out of an inability to pay for the necessities of life and those whose problems are attributable to more conspicuous consumption. It does not impose a reasonable necessity test upon the obligations a debtor is attempting to repay through the plan. If it did, then every debt being serviced under a proposed plan would potentially need to survive such scrutiny. The only plans that could be confirmed would be those for debtors who sought relief because they encountered financial difficulties from reasonably necessary debts.

In *Reyes* and *Rogers*, the Courts analyzed the payments on the debtor's vehicles to determine if they were reasonably necessary. Yet, these payments were not part of the debtor's monthly living expenses. They were to made by the trustee as part of the payments to creditors under the plan. By considering the payments in the context of disposable income, these decisions incorrectly imposed a reasonable necessity requirement on the plan's payments to pre-petition creditors and on the nature of the debtor's obligations to those creditors. While the concerns which motivated the inquiries along these lines are things

the bankruptcy courts should be sensitive to, they are not part of the disposable income test of § 1325(b). They are more appropriately addressed in the broader context of the good faith analysis required by § 1325(a)(3). Doing so gives the court greater latitude in determining the propriety of a debtor's proposal. Using the disposable income test unduly constrains the focus of the court's inquiries and restricts the flexibility inherent in the formulation of a Chapter 13 plan, by automatically precluding confirmation of any plan under which the debtor attempts to retain an encumbered asset that might be considered a luxury or unnecessarily extravagant, unless unsecured creditors are to be paid in full.

Where a debtor's living expenses are concerned, § 1325(b)(2) takes into consideration the expenses which are reasonably necessary for the maintenance or support of the debtor and its dependents. This standard contemplates something more than a subsistence level of existence. So long as a debtor's total monthly budget is reasonable and no particular expense or category of expenses is unreasonable, the expenses should be considered as being reasonably necessary for the maintenance and support of the debtor and its dependents.

The only expenses in debtor's budget that CNB challenges are those attributable to the retention of the Cadillac. It argues that because this car is a gas guzzling, luxury automobile, the expenses for fuel, maintenance and insurance are higher than they would be if debtor acquired a less expensive, more efficient vehicle. While all this may be true, these expenses are not so high that the court finds them to be unreasonable and debtor's total monthly budget is reasonable. CNB's objection to confirmation, based upon the disposable income test of § 1325(b), is overruled.

### Good Faith

Among the statutory requirements which must be fulfilled before any Chapter 13 plan can be confirmed is that "the plan has been proposed in good faith...." 11

U.S.C. § 1325(a)(3). The inquiry required by § 1325(a)(3) is one of the most important aspects of the confirmation process. Good faith is

> the policing mechanism of bankruptcy courts to assure that those who invoke the reorganization provisions of the bankruptcy law do so only to accomplish the aims and objectives of bankruptcy philosophy and for no other purpose. *In re Todd,* 65 B.R. 249, 251 (Bankr.N.D.Ill. 1986) (quoting *In re Chase,* 43 B.R. 739, 745 (D.Md.1984)). *See also Matter of Smith,* 848 F.2d 813, 821 (7th Cir.1988).

Consequently, the lack of good faith in proposing a plan requires the court to deny confirmation.

"Good faith" is not defined anywhere in the Bankruptcy Code. Indeed, it eludes a precise definition. There is no bright line test and good faith can only be identified on a case-by-case basis. The inquiry is, of necessity, fact specific. It "involves a search into the debtor's conduct and state of mind." *In re Sutliff,* 79 B.R. 151, 154 (Bankr.N.D.N.Y.1987) (citing *Matter of Yavarkovsky,* 23 B.R. 756, 759 (D.S.D.N.Y. 1982)). For this reason, the decision is "left simply to the bankruptcy court's common sense and judgment." *In re Okoreeh–Baah,* 836 F.2d 1030, 1033 (6th Cir. 1988); *Smith,* 848 F.2d at 822.

Despite this, the court's decision is not unbridled. To answer the question of good faith or the lack thereof, the court is ultimately required to determine whether or not there has been an abuse of the provisions, purpose, or spirit of Chapter 13. *Smith,* 848 F.2d at 818; *In re Rimgale,* 669 F.2d 426, 431 (7th Cir.1982); *Matter of Belt,* 106 B.R. 553, 564 (Bankr.N.D.Ind. 1989). This requires the court to examine the "totality of the circumstances." *Smith,* 848 F.2d at 818; *In re Rasmussen,* 888 F.2d 703, 705 (10th Cir.1989). Under the totality of the circumstances test, good faith means more than full disclosure and the debtor's intent to make the payments required by the plan. *Smith,* 848 F.2d at 819.

In an effort to bring demonstrable objectivity to an inquiry which is almost inher-ently subjective, the courts have identified a multitude of factors which may be worthy of consideration. The Seventh Circuit initially proposed the following list which it recognized was "by no means exhaustive." *Rimgale,* 669 F.2d at 432:

1. Does the proposed plan state [the debtor's] secured and unsecured debts accurately?

2. Does it state [the debtor's] expenses accurately?

3. Is the percentage of repayment of unsecured claims correct?

4. If there are or have been deficiencies in the plan, do the inaccuracies amount to an attempt to mislead the bankruptcy court?

5. Do the proposed payments indicate "a fundamental fairness in dealing with one's creditors?" *Rimgale,* 669 F.2d at 432–33 (citations and footnotes omitted).

Since this list was never intended to be exhaustive, in the eight years since *Rimgale* was decided, it has been expanded dramatically. The court may consider "the circumstances under which a debt was incurred and whether that debt would be dischargeable in Chapter 7." *Smith,* 848 F.2d at 821. Just as the court may consider the nature and dischargeability of the debt to the objecting creditors, it may also consider the proportion of that debt in relationship to debtor's total obligations. *Smith,* 848 F.2d at 821. The court may also consider the timing of the bankruptcy petition in relation to any judgment or other proceedings concerning this debt. *Id.*

While the amount of debtor's payments into the plan is no longer a proper consideration where good faith is concerned, *Smith,* 848 F.2d at 820; *Belt,* 106 B.R. at 569, 570; *but see In re Warren,* 89 B.R. 87, 95 (9th Cir. BAP 1988) (good faith may require more than just the debtor's best effort under § 1325(b)); *Hale,* 65 B.R. at 896 (good faith includes measuring the results of a debtor's effort), the court may consider the equities of classifying debts arising out of intentional misconduct along with ordinary unsecured obligations. *Smith,* 848 F.2d at 821; *Rimgale,* 669 F.2d

at 433 n. 22. Separate classification of non-dischargeable or potentially non-dischargeable debts would enable them to receive greater payment under the plan than debts with a less suspicious origin. *Smith,* 848 F.2d at 822.

The court may consider the duration of a proposed plan. Although good faith does not require the debtor to propose a sixty month plan, "the length [of the plan] is relevant as it relates to the debtor's state of mind and intentions." *Belt,* 106 B.R. at 569. *See also Matter of Swan,* 98 B.R. 502, 504 (Bankr.D.Neb.1989); *In re Kourtakis,* 75 B.R. 183, 187 (Bankr.E.D.Mich. 1987); *In re Doersam,* 849 F.2d 237, 239 (6th Cir.1988).

Additional factors which other courts have, from time to time, identified include:

Debtor's prior history under the bankruptcy laws, *Doersam,* 849 F.2d at 239, and "whether he has unfairly manipulated the Bankruptcy Code." *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987).

Whether the debtor has demonstrated any bona fides in dealing with his creditors. *Doersam,* 849 F.2d at 239.

Debtor's motive and sincerity in seeking Chapter 13 relief, especially in terms of whether it is to avoid repaying an otherwise non-dischargeable debt or one of rehabilitation. *Swan,* 98 B.R. at 504. *See also In re Makarchuk,* 76 B.R. 919, 923 (Bankr.N.D.N.Y.1987); *In re Zelnar,* 91 B.R. 448 (Bankr.N.D.Ohio 1988)

Whether the debtor's financial condition evidences a true need for bankruptcy relief. *Makarchuk,* 76 B.R. at 924.

The debtor's employment history, the ability to earn, and likelihood of future increases in income. *Doersam,* 849 F.2d at 239; *Swan,* 98 B.R. at 504; *Warren,* 89 B.R. at 93

The existence of any special circumstances, such as inordinate medical expenses. *Swan,* 98 B.R. at 504; *Makarchuk,* 76 B.R. at 923.

The burden the plan's administration would place upon the trustee. *Swan,* 98 B.R. at 504; *Makarchuk,* 76 B.R. at 923.

No list, however exhaustive, can be complete. The variety of factors which might be worthy of consideration is potentially infinite. *Okoreeh–Baah,* 836 F.2d at 1033. Ultimately, the court is required to examine all facets of the debtor's conduct, both before and after the petition, in determining whether or not good faith is present. *Doersam,* 849 F.2d at 239. It must do so "in light of the structure and general purpose of Chapter 13." *Doersam,* 849 F.2d at 239.

■ Not all of the factors which have ever been identified will be relevant to every case. In analyzing those factors that may bear upon a debtor's good faith or lack thereof, no one factor is or can be of paramount importance. *Belt,* 106 B.R. at 565. No single consideration, standing by itself, necessarily requires a finding of good or bad faith. Instead, it is the cumulative effect of all relevant factors which leads to such a finding. *Belt,* 106 B.R. at 565. Thus, even the most egregious pre-petition misconduct on the part of the debtor will not prevent a finding of good faith. *Smith,* 848 F.2d at 819; *Belt,* 106 B.R. at 565, 569. Conversely, where other factors demonstrate the absence of good faith, even the most herculean efforts on behalf of the debtor to repay creditors will not save it from condemnation.

■ Looking at the cumulative effect of all relevant factors, the court cannot find that debtor's plan has been proposed in good faith.

Debtor is a welder for General Motors. He has a history of steady employment and enjoys a comfortable income. Nonetheless, he has a genuine need for bankruptcy relief.

■ Chapter 13 allows a debtor to discharge debts that are not dischargeable through Chapter 7. *Compare* 11 U.S.C. § 523 and § 1328(a). A debtor's desire or attempt to do so does not preclude a finding that a plan has been proposed in good faith; this would destroy one of the major benefits of Chapter 13 where debtors are concerned. Despite the fact that a debtor may properly file Chapter 13 to obtain a

discharge of otherwise non-dischargeable debts, the dischargeability of an obligation or obligations is a legitimate consideration in determining good faith.

In this instance, there is substantial doubt that debtor's obligation to CNB would be dischargeable. Given the circumstances under which the loan was obtained, it appears that it would be excepted from discharge under § 523(a)(2)(B), as having been obtained through the use of a materially false financial statement. The loan application fails to disclose numerous and substantial obligations of the debtor and, by doing so, presents a seriously misleading picture of his financial affairs. It impliedly represents that he owns his home free and clear of any liens and encumbrances, by omitting any information concerning the identity of a mortgage holder or a monthly payment on account of the home. In reality, debtor was purchasing his home pursuant to a land contract and was required to make monthly payments in the sum of $156.00 each.

Beyond the omission of this obligation, the loan application also neglects to provide information concerning other obligations. It discloses only two debts: an existing loan from CNB and an obligation to Pacific Financial. In addition to these debts, at the time debtor sought the car loan, he had outstanding obligations to Banc One, Charles Boyce, Richard Guerrero, and Fingerhut. Mr. Jones was also delinquent in his court ordered support. These omissions, both in the number of creditors and the amount of debt involved, render the financial statement materially false. They appear to be attributable to something more than an innocent omission or good faith mistake. CNB reasonably relied upon the debtor's financial statement in extending credit to him.

The circumstances which would render the debt to CNB non-dischargeable are attributable to debtor's intentional misconduct and not to less deliberate misdeeds. See Belt, 106 B.R. at 566–567. This debt is Mr. Jones' largest single obligation. It accounts for approximately one-half of his total debt and two-thirds of the claims which may receive distributions (in any amount) through the Chapter 13 trustee.

Debtor's proposed plan extends only for thirty-six months, the minimum term permitted unless unsecured creditors are to be fully paid within a shorter period of time. See 11 U.S.C. § 1325(b)(1). Although good faith does not require a debtor to propose a longer plan, "the length [of the plan] is relevant as it relates to debtor's state of mind and intentions." Belt, 106 B.R. at 569.

Debtor has demonstrated little, if any, bona fides in dealing with his creditors, especially where the obligation to CNB is concerned. Debtor used a false financial statement to obtain a loan which was beyond his ability to pay. His default under the loan agreement was almost immediate. In the six months which passed between the date of the loan and the petition for relief, only two of the required payments were made; of these one was late. CNB apparently filed suit as a result of the default approximately one month prior to the petition for relief. Debtor's conduct, in using a false financial statement to obtain a loan which was beyond his financial capabilities, in order to purchase a new Cadillac, and his subsequent reliance on Chapter 13 when the required payments could not be made, indicates an indifference to his obligations. Reyes, 106 B.R. at 157.

Debtor's desire to retain his Cadillac "is clearly a lightening rod for criticism." Rogers, 65 B.R. at 1020. Although the desire and the effort are, to some extent, consistent with the theory behind Chapter 13, the problem lies not with the retention of the asset but, instead, with the size of the debt upon it. Rogers, 65 B.R. at 1020. The debtor acknowledged that a dependable used car could be purchased for approximately three thousand dollars. Despite this alternative, debtor would prefer to retain the Cadillac and, by doing so, dedicate the vast majority of his payments to the trustee to the satisfaction of the obligation it secures. Much like the faded nobility of Europe who, despite their present circumstances, desperately cling to the very trappings of their former status which reduced

them to poverty, debtor clings to his Cadillac. It is this car, or more accurately the loan he obtained to acquire it, that has driven Mr. Jones to seek the protection of the bankruptcy court. "Chapter 13 debtors should not be able to continue the extravagances which put them into bankruptcy, while their unsecured creditors go unpaid." *In re Reyes*, 106 B.R. at 158. *See also In re Kitson*, 65 B.R. 615, 622 (Bankr.E.D.N.C.1986).

Having considered all of the different factors which bear upon debtor's good faith or lack thereof, the court is not persuaded that the current plan has been proposed in good faith. The plan lacks the fundamental fairness in dealing with one's creditors that is expected of a Chapter 13 debtor. *Rimgale*, 669 F.2d at 432–433. It is not "a sincerely-intended repayment of pre-petition debt consistent with the debtor's available resources." *Okoreeh–Baah*, 836 F.2d at 1033. *See also In re Schaitz*, 913 F.2d 452, 453 (7th Cir.1990). It does not reflect a sincere desire to repay creditors in accordance with the spirit and purpose of Chapter 13. Instead, it reveals only a sincere desire to keep the Cadillac. The plan, as proposed, cannot be confirmed. *See Reyes*, 106 B.R. at 161. (A plan should not be confirmed when it is apparent that the sole intent of the debtor is to retain assets, not to repay creditors). This finding should not prejudice the submission of an amended plan, as it does not mean that no good faith plan can ever be submitted.

### III. Termination of the Automatic Stay

█ CNB has filed a motion to lift the automatic stay, pursuant to § 362(d)(2). This portion of the Bankruptcy Code authorizes the court to terminate the stay where a debtor has no equity in property which "is not necessary to an effective reorganization." 11 U.S.C. § 362(d)(2)(B).

Pursuant to § 362(g), CNB "has the burden of proof on the issue of the debtor's equity in property." 11 U.S.C. § 362(g)(1). It is the debtor who must carry the burden of proof on all other issues. 11 U.S.C. § 362(g)(2).

CNB has met its burden as to debtor's lack of equity. The fact that the trustee has made adequate protection payments, post-petition, does not insulate the debtor from the rigors of § 362(d)(2). Those payments have not created equity in the vehicle. They represent only the estimated periodic decline in the vehicle's value.

"Equity" as contemplated by § 362(d)(2)(A) means "the difference between the value of the property and all encumbrances against it...." *Matter of Cardell*, 88 B.R. 627, 631 (Bankr.D.N.J. 1988) (citing *Stewart v. Gurley*, 745 F.2d 1194, 1195 (9th Cir.1984). *See also In re Faires*, 34 B.R. 549, 551 (Bankr.W.D.Wash. 1983). The court has found the value of the Cadillac to be $21,800.00. It secures a claim in excess of $33,000.00. Since the debt owed exceeds the amount due on account of the liens against it, debtor has no equity in the Cadillac.

█ CNB argues that debtor's Cadillac is not necessary for his reorganization because funds are available which would allow for the purchase of another, less expensive, vehicle. An automobile is a necessity in Marion, Indiana in 1990. *See Rogers*, 65 B.R. at 1021. The fact that this car is a luxury Cadillac is irrelevant. It is debtor's only means of transportation. Therefore, although debtor has no equity in his Cadillac, it is still "necessary to an effective reorganization." 11 U.S.C. § 362(d)(2)(B).

To meet its burden of proof under § 362(d)(2), a debtor must do more than demonstrate that property is necessary to its efforts at reorganization. "Whether property is necessary to an effective reorganization depends on whether reorganization of the debtor is feasible." *In re Louden*, 69 B.R. 723, 725 (Bankr.E.D.Mo.1987).

What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect. United Savings Ass'n of Texas v. Timbers of Inwood Forest Associates*, 484 U.S. 365,

108 S.Ct. 626, 632 [98 L.Ed.2d 740] (1988) (emphasis original).

"If no reorganization ... is feasible, then no property ... can be necessary for that end." *In re Dublin Properties*, 12 B.R. 77, 80 (Bankr.E.D.Pa.1981); *Matter of Kraus*, 61 B.R. 696, 697 (Bankr.D.Neb. 1986). Thus, to continue to enjoy the protection of the stay, a debtor must also prove that there is a "reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 108 S.Ct. at 632.

The fact that the court is denying confirmation of the currently proposed plan does not mean that no plan can ever be confirmed or that any plan premised upon retention of the Cadillac would be proposed in less than good faith. Debtor is a stable and long time employee of General Motors and enjoys a comfortable income. At the current level of funding, he has the ability of proposing a plan which can fully pay CNB's secured claim, in accordance with the requirements of § 1325(a)(5)(B), and, in all likelihood, all unsecured claims as well, within the time allotted to a Chapter 13 debtor, by extending the plan beyond the currently proposed term of three years. Such a plan could enable him to not only maintain his current lifestyle, but also retain his Cadillac and pay creditors in accordance with the spirit and purpose of Chapter 13. While the debtor cannot be compelled to do so, he certainly has the ability. He should have the opportunity to take advantage of it. As a result, the court concludes there is a reasonable likelihood of a successful reorganization within a reasonable time. The motion to terminate the automatic stay will be denied.

An appropriate order will be entered.