**In re Robbin G. GILLESPIE, Debtors.**

**No. 00–02913M.**

United States Bankruptcy Court,
N.D. Iowa.

Sept. 5, 2001.

Larry S. Eide, Mason City, IA, for debtor.

Michael K. Kennedy, New Hampton, IA, for creditor.

Carol Dunbar, Waterloo, IA, Chapter 13 Trustee.

## ORDER RE: CONFIRMATION OF PLAN

WILLIAM L. EDMONDS, Bankruptcy Judge.

On November 7, 2000, debtor Robbin G. Gillespie filed a Chapter 13 petition and plan. He filed a first amended plan on April 30, 2001. Final trial on confirmation was held July 18, 2001, in Mason City. Appearing for the debtor was Larry S. Eide. Carol F. Dunbar, Chapter 13 trustee, represented herself. Michael K. Kennedy appeared for objecting creditor Ronald Bass and filed a trial brief. The court now issues its ruling. This is a core proceeding under 28 U.S.C. § 157(b)(2)(L).

### Findings of Fact

Gillespie, age 50, resides in Nashua, Iowa, with his 15–year–old son, Jesse. He

is presently employed as a truck driver and laborer for Farner–Bocken Company.

The great majority of the debt scheduled in this case relates to an incident that occurred June 22, 1996. Gillespie was involved in a fight at a bar in Bassett, Iowa. Ronald Bass was seriously injured. He was admitted to North Iowa Mercy Health Center in Mason City. During his hospital stay, Bass was seen by Dr. Byron Beasley, director of the intensive care unit. Bass suffered a head injury that resulted in some brain hemorrhage and brain swelling.

Bass has no memory of the incident. He was in a coma for nine days. Dr. Beasley believed his injuries left him in a life-threatening state for the first four days. Deposition of Dr. Beasley at 24, ll. 12–15. Bass was hospitalized for 21 days, then was treated at a rehabilitation center for an additional five days. He received additional therapy after he was released to go home. He had to relearn to walk, talk and read.

Dr. Beasley believed that Bass had not yet returned to a normal state of brain function when he was sent home from the rehabilitation unit. *Id.* at 17, ll. 1–11. Dr. Beasley was concerned that Bass could be a risk to himself because of his impaired judgment. *Id.*, ll. 12–17; p. 23, ll. 4–14. Bass was told not to drive. Bass suffered seizures. Because of the risk of seizures, he needed constant monitoring, so he moved in with his mother. Bass had been employed in construction work prior to his injury. He was unable to work for six months.

Dr. Beasley stated in 1998 that he believed Bass had, through good fortune, returned to a level of functioning very close to what he had enjoyed prior to the injury. *Id.* at 25, ll. 17–25. He thought Bass was unlikely to suffer long-term effects, though it would not be surprising if he had seizures. *Id.* at 31, ll. 16–24.

Bass documented approximately $33,000 of medical bills incurred because of his injury. Exhibits 3, 4. Bass received some compensation from the State of Iowa victims' reparation fund. An itemized bill from the hospital lists a payment of $7,105.82 made by the State of Iowa. Exhibit 4 at 19. Bass received funds also in settlement of claims against the owner of the bar and an individual named Dave Tibbits. The bar's insurance company paid Bass $90,000, but he does not recall the amount of other funds received.

Criminal charges were brought against Gillespie. In January 1997, he was found guilty of assault with intent to inflict serious injury, an aggravated misdemeanor. Exhibit 1. As a condition of probation, he made payments of $100 per month for two years to the state victims' reparation fund. A civil judgment in favor of Ronald Bass for punitive damages in the amount of $90,000 was entered against Gillespie. Gillespie has not made any payments on that debt. Bass first made collection efforts on the debt in October, 2000. Gillespie filed his bankruptcy petition on November 7, 2000.

Gillespie has five children: Jesse, Brandon, age 14, Dale, 18, Robbin, Jr., 24, and an adult daughter. Jesse came to live with Gillespie about three years ago, because his mother could no longer handle him. Gillespie receives $215 per month for support for the boy. Dale and Brandon live with Gillespie's former spouse, Deanna Gillespie. On his bankruptcy petition date, Gillespie's wages were being garnished $465.80 per month for child support. A portion of that amount was applied toward delinquent support. The garnishment was terminated. Gillespie now pays current support directly to Deanna Gillespie. On April 30, 2001, Gillespie filed amended

Schedules I and J to reflect these changes. He listed an expense of $388.17 for current support for Dale and Brandon.

Recently, Gillespie's support obligation was reduced to $291.17, because Dale graduated from high school. Based on his understanding of the divorce decree and his experience with his older daughter, however, he believes that he will continue to have a support obligation for Dale until she is 22 years old, if she continues her schooling. Dale plans to attend NIACC, the community college in Mason City, in the fall. Gillespie believes that college expenses will cause his child support obligation to return to the same $388.17 amount per month.

Gillespie formerly lived in Bassett, Iowa and was employed by P.C.I., a road construction contractor. He changed jobs when Jesse came to live with him, so that he would not be away on overnight trips. He moved to Nashua about two years ago. He worked for G & L Ladder for a time. He has now worked for Farner–Bocken for about two years. His present income is less than it was while living in Bassett.

Gillespie estimates that he earns gross wages of $1,612.37 for regular pay and $252.88 for overtime each month. His net monthly income, including $215 for child support, is approximately $1,539.05.

Gillespie scheduled the following monthly expenses:

| Rent | 325 |
| --- | --- |
| Electricity and heat | 100 |
| Water and sewer | 50 |
| Telephone | 40 |
| Food | 240 |
| Clothing | 50 |
| Medical and dental | 30 |
| Transportation | 100 |
| Recreation | 43 |
| Life insurance | 22 |
| Auto insurance | 29.50 |
| Child's allowance | 43 |
| School lunches | 27 |
| Child support | 388.17 |
| TOTAL | $1,487.67 |

The plan filed with the petition proposed a payment of $48.68 per month for 36 months. Under the amended plan, Gillespie will make payments for 60 months. Payments made on and after May 1, 2001 will be $51.38 per month. The plan provides also that Gillespie will commit all his disposable income for three years to the plan. In this regard, the trustee has already received $1,177.16 from Gillespie's tax refunds for tax year 2000 and funds that had been garnished pre-petition from wages.

There are no secured creditors in this case. Gillespie owns no real estate. He values his 1979 vehicle at $500. Child support was initially listed as a priority claim. The debt is not entitled to priority, however, because it has been assigned to the State of Iowa. 11 U.S.C. § 507(a)(7)(A). The only priority claim in the case will be attorney fees. Mr. Eide represented to the court that his claim for fees will be about $1,200.

Gillespie listed the $90,000 debt to Bass in his schedule of general unsecured claims. Other scheduled claims are $486.01 owed the clerk of court in Chickasaw County District Court for court costs in the Bass lawsuit, $90,000 identified as a potential subrogation claim resulting from the payment made by the bar's insurer, and $7,478.81 owed to Gillespie's attorney in the Bass lawsuit and in child support matters.

The deadline for filing claims was March 18, 2001. The State of Iowa filed a claim

for $4,362.19 for child support assigned to it. Bass filed a claim for $90,000. No other creditors filed claims.

Total plan payments will be $3,069.30. The trustee has already received additional disposable income of $1,177.16. The trustee's fee on the sum of these amounts would be $386.04. Assuming an attorney fee of $1,200, there would be $2,660.42 available for payment of unsecured claims.

## Discussion

■ The Chapter 13 trustee and Ronald Bass filed objections to confirmation. The trustee's objections were largely resolved by evidence at the hearing. Attorney Eide's statement to the court regarding his fees resolves her feasibility objection.

Bass contends that the plan was not proposed in good faith, as required by 11 U.S.C. § 1325(a)(3). He argues that the timing of the bankruptcy filing indicates bad faith. Bass claims that the bankruptcy filing was directed toward him, and that Gillespie's purpose is to avoid paying him the $90,000 debt for punitive damages. When Gillespie was threatened with jail for violation of probation, he was able to pay $100 per month into the victims' reparation fund. Now he is proposing to pay only $50 per month under a Chapter 13 plan filed shortly after Bass began garnishing Gillespie's wages.

Another indicator of bad faith, Bass argues, is the nature of the claim. Gillespie inflicted life-threatening injuries by willful, criminal conduct. Bass argues that, as a matter of public policy, Gillespie should not be able to use the Chapter 13 "superdischarge" to discharge his liability for debt arising from a serious criminal assault.

■ Good faith is not defined in the Bankruptcy Code, but the Eighth Circuit has stated its interpretation of the require-

ment in a number of cases. The essential question is whether the plan "constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Noreen v. Slattengren,* 974 F.2d 75, 76 (8th Cir.1992) (citing *United States v. Estus (In re Estus),* 695 F.2d 311, 316 (8th Cir.1982)). Each case must be determined on its own facts considering the totality of the circumstances. *In re Estus,* 695 F.2d at 316. In the *Estus* case, the court listed 11 non-exclusive factors that might be relevant to the inquiry. In *Education Assistance Corp. v. Zellner,* 827 F.2d 1222, 1227 (8th Cir.1987), the court noted that many of those factors had been subsumed by the disposable income requirement of § 1325(b), added to the Code in 1984. The good faith inquiry has taken a "more narrow focus." *Id.* The court must examine "whether the debtor has stated his debts and expenses accurately, whether he has made any fraudulent misrepresentation to mislead the bankruptcy court, or whether he has unfairly manipulated the Bankruptcy Code." *Id.* "The totality of the circumstances analysis adopted by *Estus,* however, remains in place." *Noreen v. Slattengren,* 974 F.2d at 76 (citing *In re LeMaire,* 898 F.2d 1346, 1349 (8th Cir.1990)).

The court believes that Gillespie has adequately explained the timing of the bankruptcy filing and his reduced ability to make payments. When Bass began collection efforts in 2000, Gillespie's wages were already being garnished for child support. The bankruptcy filing was not directed at Bass. Gillespie was concerned that he would not be able to support himself and his family on his remaining wages. He has not denied liability for the debt. *Cf. Noreen v. Slattengren,* 974 F.2d 75 (debtor filed petition 11 days before trial of suit for sexual assault). Even though most of his debts arose out of the bar fight incident, Gillespie has other creditors.

When Gillespie was paying $100 per month to the victims' reparation fund, he had a higher income than at present. Since then, he has changed jobs and has assumed responsibility for the care of his son Jesse. He proposes to pay $50 per month to a plan. Bass does not contend that Gillespie has misstated his debts or expenses, or that he has engaged in any fraudulent conduct. He does not contend that Gillespie has any greater ability to pay than he has indicated in his plan and schedules.

There is some uncertainty about Gillespie's future child support obligation. His daughter, Dale, plans to attend NIACC. Gillespie does not know what her course of study will be, but he believes his support obligation for Dale's education continues beyond high school. He has committed his disposable income to the plan for the first three years. Therefore, if Dale is not going to school at some point during that period so that Gillespie's support obligation actually decreases, disposable income can be reevaluated. The trustee should inquire into the debtor's support obligation as part of her routine disposable income analysis. If the support obligation decreases, the trustee or Bass may move to modify the plan to increase the amount of payments. 11 U.S.C. § 1329(a).

Finally, the court considers the nature of the debt as a ground for finding that the plan was not proposed in good faith. Bass argues that, as a matter of public policy, Gillespie should not be able to discharge his liability for debt arising from a serious criminal assault that inflicted life-threatening injuries.

▆ The type of debt the debtor seeks to discharge, and whether it would be dischargeable in a Chapter 7 case, continues to be a relevant factor in the good faith analysis. *In re LeMaire*, 898 F.2d at

1349; *In re Turpen*, 218 B.R. 908, 914 (Bankr.N.D.Iowa 1998). The parties agree that the debt would be nondischargeable in Chapter 7. The debtor's pre-filing conduct, however, "is not determinative of the good faith issue." *In re LeMaire*, 898 F.2d at 1352. In the *LeMaire* case, the court recognized that "a Chapter 13 plan may be confirmed despite even the most egregious pre-filing conduct where *other factors* suggest that the plan nevertheless represents a good faith effort by the debtor to satisfy his creditors' claims." *Id.* (citation omitted).

▆ The key inquiry, however, is whether the plan represents an attempt to "unfairly manipulate the Bankruptcy Code," which the Eighth Circuit has termed "central to the court's task of determining whether the plan constitutes an abuse of the provisions, purpose or spirit of Chapter 13." *Id.* at 1351.

In *LeMaire*, the debtor intentionally fired at Handeen nine times with a bolt action rifle. After pleading guilty to a charge of aggravated assault, LeMaire served a prison term of 27 months. In civil proceedings against LeMaire, Handeen obtained a consent judgment. LeMaire made payments of $3,000 on the judgment. Shortly after Handeen began garnishment proceedings to collect the balance, LeMaire filed a Chapter 13 petition. His plan proposed payment of a 42 percent dividend to Handeen and two other creditors. The bankruptcy court confirmed the plan over Handeen's objection. The district court and a panel of the Eighth Circuit Court of Appeals affirmed. After hearing en banc, the Eighth Circuit reversed and remanded.

The court found the bankruptcy court had erred by failing to give sufficient weight to the nondischargeability of the debt in a Chapter 7 and by its finding that the debtor had the proper motivation and

sincerity in seeking Chapter 13 relief. *In re LeMaire*, 898 F.2d at 1351. The court stated that the bankruptcy court had failed to "properly consider the strong public policy factors, inherent in the Bankruptcy Code, which are implicated in discharging this debt. . . ." *Id.* The court stated its belief that "there is a particularly strong policy prohibiting the discharge of a debt resulting from a willful and malicious injury following an attempted murder." *Id.* at 1353.

The court cautioned that its decision was a narrow one that was limited to the facts of the case.[1] To treat *LeMaire* as creating a public policy exception for all criminal assaults would be reading the case too broadly.

Bass argues that, although this case does not involve facts identical to those in *LeMaire*, Gillespie's conduct provokes the same level of "moral repugnancy." Gillespie acted intentionally. He caused life-threatening injuries. Assuming that this court must consider the "public policy factors . . . implicated in discharging this debt," *LeMaire*, 898 F.2d at 1351, there are not enough facts known about the incident with Bass to say whether an important public policy is implicated. Moreover, some facts tend to show the incident was less egregious than the *LeMaire* situation, which involved a premeditated attempted murder with a firearm. Gillespie's conviction was for an aggravated misdemeanor. He received probation, in contrast to LeMaire's 27–month prison term. Gillespie said that he did not start the fight and was trying to break it up. Another person, Dave Tibbits, was involved. Bass was intoxicated at the time of his admission to the hospital. Deposition of Dr. Beasley at 39, ll. 17–24 (Bass had alcohol level of "252").

The central issue, however, is whether Gillespie's plan represents an unfair manipulation of the Bankruptcy Code. *In re LeMaire*, 898 F.2d at 1351. The court concludes that it does not. Gillespie is making a sincere effort to repay his debts, within his limited means. Because Gillespie is committing his future income to making plan payments, his plan is not merely a disguised Chapter 7 liquidation. *Cf. In re Turpen*, 218 B.R. at 914–15 (debtors proposed payment of proceeds of only non-exempt assets). The plan will yield a small dividend, to be sure, but it appears to be a serious attempt to repay the debt.

Gillespie has devoted all disposable income to the plan that is required by the Code. He has already turned over a significant amount of disposable income beyond his plan payments. The plan term is the maximum length permitted by the Code. Gillespie is living a modest lifestyle, and he has proposed a reasonable budget. Child support is his largest single monthly expense item. Therefore, the court finds and concludes that the plan has been proposed in good faith as required by 11 U.S.C. § 1325(a)(3).

IT IS ORDERED that the debtor's First Modified Chapter 13 Plan (docket no. 26) filed April 30, 2001, will be confirmed by separate order to be submitted by the standing trustee. The order shall provide for payroll deduction.

SO ORDERED THIS 5th DAY OF SEPTEMBER 2001.

---

**1.** In one other case, *Noreen v. Slattengren*, 974 F.2d 75, 77 n. 6 (8th Cir.1992), the court noted that the "strong policy" referred to in *LeMaire* encompasses debt arising from sexual abuse of a minor. The court upheld a finding of bad faith on the basis of other factors.