**In re Lee GONZALES and Brenda Gonzales, Debtor.**

**Bankruptcy No. 92–21180.**

United States Bankruptcy Court,
E.D. Michigan, S.D.
Flint.

Aug. 6, 1993.
As Amended Oct. 26, 1993.

---

Michael A. Mason, Flint, MI, for debtors.

Carl L. Bekofske, Chapter 13 Trustee.

Richardo I. Kilpatrick, Rochester, MI, and Tammy Terry, Troy, MI, for Sec. Federal Credit Union.

### *AMENDED OPINION REGARDING OBJECTION TO CONFIRMATION OF PLAN*

ARTHUR J. SPECTOR, Bankruptcy Judge.

The Debtors filed a joint petition for relief under chapter 13 of the Bankruptcy Code. Their schedules showed a combined projected monthly income of $4,668.46, and projected monthly expenses of $3,368.46. From the projected $1,300 monthly excess of income over expenditures, the Debtors' plan proposed bi-weekly payments of $600 for a period of three years,[1] which they estimated would yield a dividend to general unsecured claims of roughly 28%. The trustee calculated a dividend of only 20.2%.

---

**1.** At the confirmation hearing, the Debtors stated that if the Court sustained the objection to confirmation of their plan, they would extend the term of their plan to four years.

Security Federal Credit Union objected to confirmation of the plan. Among other things, this objection was based on the Credit Union's contention that the plan did not provide for the application of all of the Debtors' disposable income to make payments under the plan. Specifically, the Credit Union cited the Debtors' scheduled expenditures of $460 per month for travel expenses, books, etc. related to Mrs. Gonzales' masters program, and $500 per month in college expenses for their adult children, Ehren and Gretchen.

At the confirmation hearing, the Debtors orally amended their plan to include all income tax refunds,[2] and to provide that when Ehren graduates (which is anticipated to occur by June, 1994), they would increase the amount of their payments by the amount they now provide to Ehren.

Mr. Gonzales testified that Ehren, age 21, and Gretchen, age 19, are students at Michigan State University. During the school year, the Debtors give Ehren approximately $300 per month and Gretchen approximately $400 per month for rent, utilities, food, clothing, toiletries, entertainment, books, supplies and transportation. Both children hold part-time jobs and obtain loans whenever possible. According to Mr. Gonzales, however, without the monthly stipend from their parents, the children could not fully support themselves.

Regarding his wife's own educational costs, Mr. Gonzales testified that she is enrolled in a masters program in anthropology at Wayne State University. He stated that his wife's job as an hourly employee in General Motors' Buick Division is in jeopardy due to potential bumping by more senior union employees when (and if) other GM plants close. Mrs. Gonzales is also currently working toward obtaining her teaching certificate at the University of Michigan—Flint campus. The Debtors expect that it will take approximately two more years for Mrs. Gonzales to obtain her masters degree, after which she intends to immediately commence working for her PhD, and to ultimately become a teacher. Whereas the Debtors' expenses for their childrens' education was roughly $200 more than projected in the Debtors' Schedule J, Mr. Gonzales indicated that his wife's costs in pursuing her masters program were roughly $260 per month, or about $200 less than originally estimated in Schedule J. The expense involved in seeking a PhD was not projected.

A chapter 13 plan cannot be confirmed over the objection of the trustee or an unsecured creditor unless "the plan provides that all of the debtor's projected disposable income to be received in the three-year period beginning on the date that the first payment is due under the plan will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). The term "disposable income" is defined as "income which is received by the debtor and which is not reasonably necessary to be expended—(A) for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2)(A).

According to the Credit Union, Mrs. Gonzales' educational expenses are not reasonably necessary for her maintenance or support. Nor, it argued, are the payments for the children's education. Indeed, it asserted that the Debtors' children—having reached the age of majority—do not qualify as "dependents" of the Debtors.

At the conclusion of the hearing, I found that if the Debtors' children were their dependents for purposes of § 1325(b)(2)(A), the amounts the Debtors pay to support them in college were reasonably necessary. However, I reserved decision on the issue of dependency, as well as on the question of whether the expenditures for Mrs. Gonzales' continuing education are reasonably necessary for her maintenance or support. For the reasons which follow, I hold that the children are dependents. I also hold that the plan as originally filed cannot be confirmed because it does not provide that all of the Debtors' disposable income for a period of three years would be applied to

---

**2.** This commitment may be illusory because the Debtors failed to accompany their offer with a promise not to adjust the amount to be withheld from their wages. And since the amount of any such refunds was not quantified, no value is ascribed to this offer.

make payments to creditors. However, the Debtors having stated at the confirmation hearing that they would extend the term of their plan to four years should the Credit Union's objection to confirmation be sustained, the plan as so amended does satisfy the disposable income or so-called "best-efforts" test under § 1325(b)(1)(B) and therefore will be confirmed.

### THE DISPOSABLE INCOME TEST

■ Since § 1325(b)(2)(A) speaks in terms of expenditures that are "reasonably necessary," it is safe to assume that the judicial distinction between disposable and nondisposable income must be made by an objective, reasonable-person standard. The more difficult question concerns how one defines this standard.

There are expenditures that a chapter 13 debtor might make which all reasonable people would agree are excessive—such as for a yacht or personal jet. At the other end of the spectrum, there are expenditures nobody could reasonably challenge—such as for food and shelter. The problem lies in the vast gray area between these extremes—i.e., those expenditures with respect to which reasonable people could disagree on the question of whether they are appropriate under the circumstances.

One approach a court could take in deciding this question would be to hold a particular expenditure to be "reasonably necessary" if it concludes that reasonable persons could disagree as to whether the expenditure is reasonably necessary. Because this in effect means that an expenditure would be allowed even if only a small minority of reasonable people would view the expenditure as appropriate, it is too lenient. *See In re Jones*, 55 B.R. 462, 466, 13 B.C.D. 1116 (Bankr.D.Minn.1985) ("The purpose of Chapter 13 is to provide the maximum recovery to creditors while at the same time leaving the debtor sufficient money to pay for his or her basic living expenses."); *In re Packham*, 126 B.R. 603, 610, 21 B.C.D. 1033 (Bankr.D.Utah 1991); S.Rep. No. 65, 98th Cong., 1st Sess. 22 (1983) ("Chapter 13 relief is essentially equitable, and contemplates a substantial ef-

fort by the debtor to pay his debts. Such an effort, by definition, may require some sacrifices by the debtor, and some alteration in prepetition consumption levels." (*quoted in In re Stein*, 91 B.R. 796, 801 n. 1, 19 C.B.C.2d 1138 (Bankr.S.D.Ohio 1988) and in *In re Navarro*, 83 B.R. 348, 354, 17 B.C.D. 361 (Bankr.E.D.Pa.1988))).

Conversely, a court might hold an expenditure to be excessive if *any* reasonable person could view it as such. This standard swings too far in the opposite direction, making it virtually impossible for the debtor to justify other than the most vital of expenditures. *See In re McDaniel*, 126 B.R. 782, 784, 21 B.C.D. 1043 (Bankr. D.Minn.1991) ("Expenses that are not absolutely essential to the maintenance and support of debtors can nonetheless be 'reasonably necessary'....").

A third approach would follow the simple majority. If the court concludes that most (reasonable) people would view the expenditure as excessive, then the expenditure will be so treated. There is much to recommend this approach: it is more moderate than either of the other two approaches mentioned and, because it yields to the perceived consensus, it could promote consistency and uniformity among the courts regarding this issue.

In most cases, however, this approach is unworkable because there is little or no evidence upon which the judge can rely in determining whether "most people" would regard a particular expenditure as reasonable. And while it is always appropriate to refer to whatever case law is on point, the infinite variety of factual contexts in which these cases are decided, as amply demonstrated by a review of the reported decisions in this field, along with what is likely to be a relatively small number of pertinent decisions, do not make this source a particularly reliable means for eliciting a consensus.

Given these limitations, the decision of whether a particular expense is reasonable is and ought to be based on the judge's own opinion, for the judge is, in § 1325(b)(2) decision-making, the hypotheti-

cal reasonable person.[3] *See In re Sutliff,* 79 B.R. 151, 156 (Bankr.N.D.N.Y.1987) ("However, an inquiry into a debtor's 'reasonably necessary' expenses is unavoidably a judgment of values and lifestyles and close questions emerge."); *In re Rogers,* 65 B.R. 1018, 1021 (Bankr.E.D.Mich.1986) ("This question unavoidably involves the bankruptcy court in difficult value judgments. . . . It's an unpleasant job, but someone has to do it . . . [T]he someone is the bankruptcy judge."); K. Lundin, 1 *Chapter 13 Bankruptcy* § 531, pp. 5–98*l*–99 (Wiley Law Publications, 1992) (compiling and comparing cases) ("Determining reasonable necessary expenses drags the bankruptcy court into approving or disapproving of the debtor's lifestyle. . . ."); p. 5–98d ("The courts are struggling because the disposable income test inevitably involves bankruptcy judges in lifestyle decisions for Chapter 13 debtors.").

The courts have consistently held that for purposes of § 1325(b)(2)(A), the phrase "maintenance or support" includes expenses for items or activities other than those which, such as food, clothing and the like, are clearly essential. *See, e.g., In re Anderson,* 143 B.R. 719, 721 (Bankr.D.Neb. 1992) ("Some discretionary expenses are necessary for maintenance and support. . . ."); *In re Edwards,* 50 B.R. 933, 941 n. 9, 13 B.C.D. 250, 13 C.B.C.2d 255 (Bankr.S.D.N.Y.1985) ("[S]ome recreation is justifiable and beneficial to family harmony and happiness."); *In re Tinnenberg,* 59 B.R. 634, 635 (Bankr.E.D.N.Y.1986). Indeed, the expense budget form prescribed by the Official Forms (Schedule J) recognizes that a family cannot live by bread alone. It acknowledges that there ought to be some allocation for "recreation, clubs, entertainment, newspapers, magazines, etc." and even "other." As with the debtor's other expenditures, of course, the statute limits this spending to that which is "reasonably necessary."

Even non-discretionary expenditures such as for food and shelter can reflect discretionary lifestyle choices. Thus a debtor whose monthly car payment exceeds that which is reasonably necessary is in reality making a discretionary expenditure to the extent of the excess. *See Rogers,* 65 B.R. at 1021. No matter where the "fat" is hidden, such discretionary expenditures typically have more to do with enhancing one's quality of life, acquiring spiritual fulfillment or just simply relaxing and enjoying oneself, than with subsistence. Since no two people have the same tastes, interests or philosophical dispositions, these discretionary costs can run the gamut from making charitable donations to buying a ticket for a tractor-pull event.

■ By lumping all discretionary expenses together, whether they derive from categories more commonly thought of in subsistence terms or from categories commonly thought of as clearly discretionary in nature, the bankruptcy judge will often obviate the need to pass judgment on specific expenditures, that is to say, micromanage the details of a debtor's life. *See, e.g., Anderson,* 143 B.R. at 721 ("Courts should not become preoccupied with the exercise of a 'line item veto' over budget items. . . . Chapter 13 debtors should be permitted to budget a reasonable amount for miscellaneous discretionary expenditures and the funds may be used for such purposes as debtors may determine."). The disposable-income test is designed to balance the interest of creditors with the interest of the debtor in obtaining a fresh start.[4] Thus

---

**3.** Of course, the more subjective the decision, the less predictable the result. But when Congress leaves something to judicial discretion, it tolerates as a necessary evil the probability that similar cases may be decided differently. At least with respect to the area within the court's discretion, Congress presumably believes that flexibility to do justice is a higher objective than predictability. Attempts to construct "guidelines" and lists of multiple factors cannot hide that what is sought and what is delivered is the subjective choice of the judge hearing the case.

**4.** It presumably is *not* intended to provide a vehicle by which the judge is to tell the debtor how he should enjoy that fresh start. *Cf.* Lundin at 5–98t–98u ("Bankruptcy courts allow debtors a monthly allowance for recreation without presuming to dictate whether the debtor can spend those funds to see 'Terminator II' at the movies.").

the proper methodology is to aggregate all expenses projected by the debtor which are somewhat more discretionary in nature, and any excessive amounts in the relatively nondiscretionary line items such as food, utilities, housing, and health expenses, to quantify a sum which, for lack of a better term, will be called "discretionary spending."

The task before me, therefore, is to identify how much of the Debtors' anticipated expenses are discretionary in nature and to weigh them on this scale. If the discretionary expenses in the aggregate allow the Debtors to exceed their basic needs, including a reasonable reserve for recreation and exigencies (the reasonable "cushion"), then their plan cannot be confirmed.[5]

First I will address whether Mrs. Gonzales' educational expenditures should be characterized as discretionary. Then I will discuss whether the children are the Debtors' dependents.

### MRS. GONZALES' MASTERS PROGRAM

Mrs. Gonzales has a full-time job with General Motors Corporation. Her Schedule I indicates that she has worked at the Buick plant for about 15 years and takes home over $2,000 per month on a gross pay of over $3,000 per month. While many Flint employees of GM have reason to worry about continued employment, the potential loss of employment is no different in kind than that shared by workers everywhere. It is probably no greater than the worry about the continuity of income borne by self-employed business or tradespeople. Nor was there any showing that Mrs. Gonzales (who did not testify) had any special or particular reason to fear loss of her job.

■ Thus I cannot help but believe that Mrs. Gonzales' educational expenses are

part of a commendable ... though entirely discretionary ... attempt to better herself. An advanced degree is laudable, and may well improve one's income-earning potential, but it cannot fairly be characterized as something that no reasonable person would expect the Debtor to do without. One way of looking at this type of expenditure is as an investment in herself. And "[a]s a general rule, investments are not reasonably necessary for the maintenance or support of the debtor." *See* Lundin, § 5.31, p. 5–98p. "Investments ... are therefore made *with* disposable income; disposable income is not what is left after they are made." *In re Lindsey,* 122 B.R. 157, 21 B.C.D. 399 (Bankr.M.D.Fla.1991). Accordingly, Mrs. Gonzales' pursuit of advanced degrees is a discretionary expenditure not different in kind from other discretionary expenses such as recreation.

### ARE THE CHILDREN "DEPENDENTS"?

The Debtors argued that the term "dependent," which the Code does not define, means "a person who is supported financially by [the] debtor[ ] and who reasonably relies upon such support." P. 6 of Debtors' Brief. As acknowledged by the Credit Union, *see* Credit Union's brief at p. 3, this formulation is consistent with what appears to be the majority view on the issue. *See generally In re Rigdon,* 133 B.R. 460, 463–66 (Bankr.S.D.Ill.1991) (collecting cases). I will therefore adopt the Debtors' definition, but with a clarification. One could certainly argue that it is always "reasonable" for the recipient of financial assistance to rely on such assistance: the more pertinent question is whether it is reasonable under the circumstances for the court to permit the debtor to undertake the obligation of supporting the would-be dependent.[6]

---

**5.** Since no party challenged the amounts that the Debtors budgeted for housing, transportation, food, clothing, medical and business expenses, I assume that those amounts are appropriate, and that therefore no portion of these expenditures are excessive and thereby fall into the domain of discretionary spending.

**6.** For example, a chapter 13 debtor may propose to donate virtually all of her income to an

orphanage, with unsecured creditors being paid only a small percentage of their claims. If the debtor argued that the orphans are her dependents, it makes little sense for the court to launch an inquiry into whether these children "reasonably rely" on the debtor's support. The real issue is whether it is reasonable to permit the debtor to assume such an obligation.

As a starting point, I agree with those cases which have rejected the notion that the existence of a legal obligation to provide support should be used as a hallmark in determining whether a dependent relationship exists for Code purposes. *See In re Tefertiller,* 104 B.R. 513, 515 n. 1 (Bankr.N.D.Ga.1989) (interpreting § 707(b)); *In re Braley,* 103 B.R. 758, 760, 19 B.C.D. 1133, 21 C.B.C.2d 729 (Bankr. E.D.Va.1989), *aff'd sub. nom. Waites v. Braley,* 110 B.R. 211 (E.D.Va.1990) (§ 707(b)); *In re Dunbar,* 99 B.R. 320, 324–25, 19 B.C.D. 446 (Bankr.M.D.La.1989) (§ 1325(b)(2)(A)). For example, a debtor should not in effect be made to withdraw all support to a child who reaches the age of majority if that child is unable to find gainful employment because of a severe physical handicap. The debtor's legal obligation to provide support may no longer exist, but it would be manifestly unreasonable to require the debtor to stop providing the child with basic needs such as food and clothing as a condition for plan confirmation.

On the other hand, it is also clear that at some point in time, under some circumstances, the debtor's moral obligation to provide support for her children becomes ·sufficiently tenuous that it must yield to the countervailing interest of the debtor's creditors in receiving payment. Assume, for instance, that a healthy 40–year old decides to quit her well-paying job so that she can attend an expensive college to study the classics. If the parents of this 40–year old file a chapter 13 petition, I think virtually everyone would agree that it is ridiculous to expect their creditors to finance any part of the child's education.[7]

The response that most people would have to this latter case obviously differs from the one involving the handicapped child. And it is easy to construct a continuum which creates more difficult choices as one approaches the center. At the midpoint reasonable people, (i.e.: reasonable bankruptcy judges) could differ on whether the debtor ought to be allowed to accept the duty of support. Once again the choice is quite subjective.

■ In my view, debtors may continue to assist (i.e. support) a child, who notwithstanding having attained majority, has not yet "left the nest" without forfeiting the opportunity to repay their creditors through chapter 13. Although this view is not without possible exceptions, (e.g.: a "professional student" of 40 who refuses to leave the nest), when the case involves relatively young adults studying for their baccalaureate degrees at a relatively reasonably-priced state university, one cannot say that, in everyday parlance, the children are not still "dependent" on their parents.

Indeed, as the Debtors aptly noted, Ehren and Gretchen are still considered dependents of their parents by the Internal Revenue Service and by the Debtors' medical and hospitalization insurer. In short, society is prepared in this day and age to accept the notion that a 19–year old and a 21–year old undergraduate college students are still their parents' dependents. At the very least, just as society accepts as reasonable an adult child's assumption of the moral obligation to support an aged or infirm parent, it now accepts as reasonable a parent's own feeling of the moral imperative of assisting a willing child to obtain a higher education.

The few cases cited by the parties which deal with the issue of educational expenses of adult children in a § 1325(b) context address only the reasonableness of the amounts spent; they implicitly accept that the adult children are dependents of the

---

**7.** One could plausibly argue that these kinds of considerations are more appropriately considered in the context of whether a particular expenditures is "reasonably necessary" under § 1325(b)(2), rather than whether the beneficiary of the expenditure is a "dependent" of the debtor. But I think a more natural reading of that statute leads to the conclusion that the "reasonably necessary" language refers only to the acceptable level of support, and presupposes that the person receiving the support is in fact entitled to *some* level of support. Disputes concerning the more fundamental question of whether there exists a legitimate right to receive *any* support from the debtor—"necessary" or otherwise—should therefore focus on whether the recipient is in fact a "dependent."

debtors. *See In re Killough,* 900 F.2d 61, 66 n. 10 (5th Cir.1990); *Jones, supra.* The Debtors' children, although above the age of majority, have within society's current expectations reasonably not yet left the nest. Their parents cannot be faulted for giving them a small assist until their wings alone can support them [8].

Accordingly, I hold that Ehren and Gretchen are dependents of the Debtors for purposes of § 1325(b), and that parental support while they attend college is more like a non-discretionary expenditure than the alternative. Since I previously determined that all of the monthly $300 for Ehren and $400 for Gretchen was reasonably necessary, and thus not excessive, none of those sums will fall within the category of discretionary spending.

### REASONABLENESS OF DISCRETIONARY EXPENDITURES

The bottom line for judging how much a debtor may withhold from his creditors under § 1325(b)(2)(A) as "reasonably necessary for ... maintenance or support" was stated in *Jones* in these terms: "[T]he appropriate amount to be set aside for the debtor ought to be sufficient to sustain basic needs not related to the debtor's former status in society or the life style to which he is accustomed....", 55 B.R. at 466, citing *In re Taff,* 10 B.R. 101, 107, 7 B.C.D. 493, 4 C.B.C.2d 65 (Bankr.D.Conn. 1981) (discussing appropriate standard under 11 U.S.C. § 522(d)(10)(E)). Debtors cannot use chapter 13 as a means "to continue in the lifestyle that drove them to file bankruptcy and at the expense of their creditors." *Sutliff,* 79 B.R. at 157; *but cf. Anderson,* 143 B.R. at 721 (suggesting that

higher-income debtors should be able to "retain a greater dollar amount for discretionary expense" than others).

This view, however, must be tempered somewhat since Congress did not direct that to qualify for chapter 13 relief a debtor must take a vow of three years of monastic existence. Instead, Congress demanded only *"some* sacrifices ... and *some* alteration in prepetition consumption levels," S.Rep. No. 65, *supra* at p. 607, and not the maximum possible. *See also* 5 *Collier on Bankruptcy,* ¶ 1325.08[b] (15th ed. 1993) ("Hence, a court determining the debtor's disposable income is not expected to, and should not, mandate drastic changes in the debtor's lifestyle to fit some preconceived norm for chapter 13 debtors."). The ultimate question therefore is whether discretionary spending of $330 ($70 in scheduled monthly recreation expenses and $260 for the masters program) is too large to be reasonable. After considering all of the evidence adduced, I hold that it is.

The Debtors have, for Flint standards, a relatively high income. They admit to a gross income of almost $76,000 per year, and take home of almost $4,300 per month. And the Debtors do propose to pay $1,300 per month for three years to the trustee towards repayment of their substantial debts (over $97,000). But most of the money paid to the trustee will merely go towards making the Debtors' large monthly mortgage payments on two different properties. The plan proposes that the trustee pay $636 per month towards the two mortgages on the Debtors' home. The trustee is also directed to pay another $227 per month towards a mortgage on some income property inherited by Mr. Gonzales

---

[8]. One could argue that the Debtors and their children had other options at their disposal. For example, the children could attend a college closer to home and live at home. They could attend college part-time while working full-time, or even postpone college for a few years and save for their tuition. And in three years, when the Debtors have consummated their plan, they will be in a much better position to subsidize their children's education than they are now.

Furthermore, some might argue that although the children's desire for a college education is commendable, we are not yet at the stage where one could call it essential, in the sense that food, shelter, medicine or even compulsory primary education is. The simple answer to this argument is that something need not be essential to pass the test. Only the most cold-hearted would criticize a debtor for providing support to an aged or infirm parent on the ground that the government would provide the basic food, clothing and shelter at an institution.

from his father's estate.[9] Thus, of the $1,300 going to the trustee, after his commission and the mortgage payments, the amount available for other purposes is only $372.[10] After paying the mortgage arrearages (totalling $2,377 with interest), miscellaneous priority claims and a small secured claim on a stereo,[11] the balance remaining for unsecured non-priority creditors is only about $7,300. By the Debtors' estimates, they have over $26,000 in such debt; therefore, the anticipated dividend, by the Debtors' calculations, is only 28%. (As stated earlier, the trustee calculated only a 20.2% dividend. This is most likely a result of higher claims filed by the general unsecured creditors or those in senior classes.)

Meanwhile the Debtors would enjoy a cushion of $330 per month. Whereas all unsecured creditors as a class will receive, by the Debtors' more generous calculations, no more than about $7,300, the Debtors will keep $11,880 ($330 per month for 36 months, the length of their plan). The result of the plan would be that the Debtors keep their home and the other parcel of land, curing the defaults on the mortgages; keep their four vehicles (Schedule B lists two vehicles besides the ones the Debtors will pay off outside the plan—see n. 11); maintain their style of living without apparent modification (sending two children to college and pursuing a masters program, etc.), all the while paying only a relatively small dividend to their general unsecured creditors. Under the plan offered by the Debtors originally, they would be making no real sacrifices. While a court should not require a debtor to give up all of life's pleasures, Congress does expect that a chapter 13 debtor make "a substantial effort ... requir[ing] some sacrifices ... and some alteration in prepetition consumption

levels." S.Rep. No. 65, *supra* at p. 607. Confirming such a plan would not be equitable.

I therefore conclude that although some cushion would be appropriate, $330 per month in this case is excessive. Some of that amount is disposable income. As that disposable income is being retained by the Debtors, I hold that the plan does not provide that all of the Debtors' disposable income for the three years of the plan "will be applied to make payments under the plan." 11 U.S.C. § 1325(b)(1)(B). Accordingly, I will sustain the Credit Union's objection and deny confirmation of the original plan.

### THE MODIFIED (FOUR–YEAR) PLAN

Anticipating this result, the Debtors stated at the confirmation hearing that if the Court determined that their original plan failed the disposable income test, they wished to extend it by a year. In this way they intend to pay at a more leisurely rate the amount that § 1325(b) requires them to pay to creditors. From the bench, I have routinely held this alternative to satisfy the disposable income test. Other courts have ruled similarly. For example, in *In re Wood*, 92 B.R. 264, 266 (Bankr.S.D.Ohio 1988), the court explained:

Absent unusual or egregious circumstances, ... an objection to confirmation based upon the "disposable income test" is not valid if the length of the proposed plan exceeds 36 months, and after the time value of the extended repayment period is considered, the proposed monthly payments to the Trustee produce a significantly higher dividend for general unsecured claimants than would be paid if the objection to confirmation were sustained, all income not reasonable re-

---

**9.** As the rental received covers the mortgage payments, property taxes, insurance and upkeep, the property pays for itself. Also, very little equity will be built up during the term of the plan. Therefore, the retention of this property has little effect on the § 1325(b) analysis.

**10.** The trustee's commission is 5%, yielding him $65 per month. The total of mortgage payments is $636 + $227, or $863. Taking $863 and $65 from $1,300 leaves $372 per month.

**11.** In addition, the Debtors propose to make the regular monthly payments towards two vehicle loans "outside the plan;" i.e. the expense of repaying this debt is reflected in the Debtors' monthly budget as an expense instead of being paid to the trustee for forwarding to the creditors. These payments amount to almost $550 per month.

quired for support were paid into the plan and the debtors chose to exercise their right to limit such payments to a 36–month period.

*Cf. In re Ivy,* No. 88–141–FR, 1988 WL 409629, 1988 U.S. Dist. LEXIS 2325 (D.Or. Mar. 11, 1988); *aff'd* 920 F.2d 936 (9th Cir.1990) (table); 5 *Collier on Bankruptcy,* ¶ 1225.04 ("[T]he debtor can be required to extend the term of the plan for an additional year or two to make up the amount reserved [by the debtor and not paid to the trustee].").

The only value judgment necessary in deciding whether a plan exceeding three years satisfies the disposable income test where a similar three-year plan would not is in determining how much of the disputed amount is disposable income. The analysis is strictly mathematical thereafter.

After the court determines the extent to which the debtor's budget exceeds what the court deems to be a reasonable amount, it adds that amount to the monthly payment proposed by the debtor in the plan. It then multiplies that result by 36, as § 1325(b)(1)(B) requires all disposable income over only a three-year period. The result represents the total amount that the debtor would have to pay under a three-year plan in order to satisfy § 1325(b)(1)(B).

Next, the court computes the total amount to be paid by the debtor pursuant to the extended plan. It then compares that amount with the three-year minimum payment, adjusted to include the interest that those payments would have earned during the extension period.[12]

In this case, if we assume that *all* of the monthly $330 which constitutes the Debtors' discretionary expenditures is not reasonably necessary for their maintenance or support, then the Debtors should be paying not $1,300 per month, but $1,630 per month. As a result, the minimum payment to creditors for three years would be $58,680 ($1,630 × 36 = $58,680). Further assume that if creditors could have received the entire $58,680 within three years, they would be able to safely invest those funds for the fourth year at current interest rates, which I estimate to be about 3.5%. This would yield them another $2,053.80, or a total recovery over four years of $60,733.80 ($58,680.00 + $2,053.80 = $60,733.80). This is less than the $62,400 in payments that the Debtors' four-year plan will provide ($1,300 × 48 = $62,400).[13] The Debtors' modified plan therefore passes muster under § 1325(b) and will be confirmed.

---

**12.** In some cases, it may be simpler for the court to multiply the amount of disposable income omitted from the proposed monthly plan payments by 36, and compare that figure to the sum of all payments to be made in years four and five (if applicable) of the extended plan.

**13.** It should be apparent that the Debtors' modified plan satisfies the statutory minimum by much more than this analysis lets on. For one thing, even a 4% interest rate would not change the result. ($58,680 x 104% = $61,027.20, which is still less than $62,400.) For another, the analysis assumes no discretionary expenditures at all, not even the $70 per month allocated without contest as "recreation." ...

It should also be remembered that the modified plan does not propose four years of $1,300 monthly payments. The modified plan contains a pledge that when Ehren graduates, the $300 per month now spent towards his support will be paid to the trustee. Thus by at least June, 1994, the plan will provide for payments of $1,600 per month. Although I have not done the math, years of payments at this higher monthly amount may very well yield 100% repayment to all creditors. (The Debtors' counsel represented that by his calculations, which did not consider this additional $300 per month, a four-year plan would yield general unsecured creditors about 62%.)