**In re Frank GONZALES, Debtor.**

**No. 13–03–10290 SR.**

United States Bankruptcy Court, D. New Mexico.

Aug. 22, 2003.

Ronald E. Holmes, Albuquerque, NM, for Debtor.

Adam D. Rafkin, Ruidoso, NM, for Creditor.

### MEMORANDUM OPINION AND ORDER CONFIRMING CHAPTER 13 PLAN

JAMES S. STARZYNSKI, Bankruptcy Judge.

The Chapter 13 Plan (doc 3) of the debtor Frank Sanchez Gonzales (sometimes "Debtor") and the objections thereto from Roger "Blue" Dutchover (doc 6) and from the chapter 13 trustee Kelley Skehen (doc 8 and 11) came before the Court for a confirmation hearing in Roswell, New Mexico, on June 16, 2003. Holmes & Associates, P.C. (Mr. Ron Holmes) represented the Debtor, Mr. Adam Rafkin repre-

sented Mr. Dutchover, and Ms. Annette DeBois represented the Chapter 13 trustee ("Trustee"). The Court will confirm the plan.

## FACTUAL AND PROCEDURAL BACKGROUND

Sometime in 1994 or earlier, Mr. Gonzales and Mr. Dutchover got into a fight with each other, one outcome of which was that Mr. Dutchover sustained knife wounds requiring over 300 stitches to repair. Subsequently a Lincoln County jury found Mr. Gonzales guilty of aggravated battery (deadly weapon) and he was sentenced accordingly. (Exhibit A.) On June 30, 1999, a stipulated final judgment was entered against Mr. Gonzales in a Lincoln County civil action, awarding Mr. Dutchover damages of $20,000 with interest to accrue at 18% per annum. (Exhibit B.) According to Mr. Dutchover, by the time the Debtor filed his chapter 13 petition, the principal and accrued interest totaled $36,086.43.

On March 4, 2002, the Debtor and his spouse filed a chapter 7 case (no. 7–02–11527), from which they received a discharge. Debtor filed this chapter 13 case on January 15, 2003. During the chapter 7 case, Mr. Dutchover had filed an adversary complaint contesting the discharge of the debt owed to him by Debtor; the complaint was dismissed without prejudice after the filing of the chapter 13 case. Debtor's chapter 13 schedule F listed Mr. Dutchover's claim as the only non-priority unsecured claim.

Debtor timely filed his chapter 13 plan, and Mr. Dutchover timely objected to confirmation, as did the Trustee. The plan provided for monthly payments of $85 for 36 months, which the Debtor then estimated (before incurring attorney fees to litigate plan confirmation) would pay about 5% on Mr. Dutchover's claim. At the confirmation hearing, Debtor orally extended the plan to sixty months. At closing argument, based on Mr. Holmes' estimate of $3,000 for his attorney fees, the Court confirmed with the parties that the likely total payout to Mr. Dutchover would be about $1,600.[1]

Mr. Dutchover objected to confirmation on the grounds that the plan did not pay him as much as would a chapter 7 case in (or during) which Mr. Dutchover obtained a non-dischargeability judgment,[2] and that the plan had not been filed in good faith. In her opening statement, the Trustee raised the good-faith objection, and also that the Debtor had not disclosed a car (a 2002 Chevrolet Cavalier) on schedule B or the debt for that car on schedule F. The Trustee's written objections to confirmation were that the Debtor had not provided

---

1. The calculation is as follows: 60 months × $85 = $5100–$510 (chapter 13 trustee fees) = $4590–$3000 (attorney fees) = $1590.

2. This is not the correct interpretation of the "best interests" test of § 1325(a)(4), which requires that "the value ... of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount that would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date." The measure of distribution contemplated is what the dividend on an unsecured claim would be from the proceeds of the estate property. Mr. Dutchover's interpretation of the statute would measure his chapter 7 distribution by what he was able to (also) collect outside the chapter 7 case from the Debtor. Or perhaps he is measuring his chapter 7 distribution simply by the amount of the claim itself, ignoring that elemental distinction between having a claim and getting paid on it. *Ravenot v. Rimgale (In re Rimgale)*, 669 F.2d 426, 430–31 (7th Cir.1982)(Amount to be distributed on a claim in a liquidation does not include what a creditor might be able to collect after the liquidation; if any creditor with a nondischargeable debt could veto a chapter 13 plan, the generous discharge provisions of chapter 13 would be illusory.)

to her office certain documents such as pay stubs and tax returns, the Debtor sought to pay $300 per month for a car that he did not own (the same one not disclosed on schedule B or F), the monthly payment on the car was $260 rather than $300 so the extra $40 should go into plan payments, the Debtor's life insurance payments were excessive and in any event unnecessary and thus those monthly payments should also go into the plan,[3] and the plan was unfeasible because of the Debtor's monthly insurance payments.

The Debtor's budget (schedules I and J) shows that the total annual gross income of the Debtor and his spouse is about $24,000; that income supports the Debtor, his spouse, their son Gonzales Gonzales, who is 18 years old, and a granddaughter Reyna, who is nearing 18. Disposable income is $87 per month. Schedule J includes life insurance at $73 per month (for a policy with a face amount of about $6,000), nothing for health insurance, and $300 for "other", which is for the Cavalier. The other expenses on Schedule J appear to be reasonable; they include a "food" item for $700 per month, which Debtor testified would likely be reduced somewhat now that another grandchild, who had resided with them until recently, moved out. Schedule A listed unencumbered real property, the home, at $20,000; schedule B listed items totaling $2,400, among them a

1980 Chevrolet pickup truck valued at $700.

Most of the testimony at trial was from Mr. Gonzales, whom the court found to be a credible witness. Under examination and cross-examination, he testified generally as follows: He is 62 years old; he and his spouse Mildred Gonzales live in Ruidoso Downs, New Mexico.[4] He now works as a sawyer; that is, he operates a chain saw in thinning forests and different people, including one of his sons, hire him at about $7.00 per hour. Previously, in addition to contract labor as a sawyer, he worked as a maintenance and cleaning person. Three to four weeks before this trial commenced, his spouse Mildred began working at a Wal–Mart for $8.00 per hour; she no longer has the jobs she previously worked at cleaning houses and condominiums. (Exhibits 4, 5 and 6.) The Statement of Affairs discloses that for calendar years 2002 and 2001, he and his wife had joint annual income of about $25,000, consistent with what they are earning now.

Debtor and his spouse are paying GMAC $263 per month for the Cavalier, which the family is using. Exhibit 1. They are also paying $487 every six months for the required New Mexico liability insurance for the Cavalier.[5] Exhibit 3. As explained by the debtor and by a letter from his daughter Theresa Rosas (exhibit 2), the car and insurance are being purchased in

---

3. The testimony was that the Debtor and his spouse pay $73 per month for a policy that on death will pay out $6,000 either to him or his spouse, or jointly to their eight children in the event of a simultaneous death. Partial trial transcript, p. 27, line 17–p. 29, line 19. The value of this policy in relation to the size of the premium clearly raises questions about the value of the investment; in fact, it raises questions about whether the Debtor was mistaken in his testimony about the face value of the policy. Nevertheless, the Court declines to rule that the terms are so outlandish, or that the Debtor and his spouse are so old or

are spending their income so unwisely, that they must give up the policy.

4. The petition states that Debtor's principal place of business is Bernalillo County. That is clearly erroneous, especially for someone whose occupation is a woodcutter. The Court has assumed that the error is an inadvertent one arising from the counsel's filling out the petition.

5. Prorated monthly, the car insurance premium more than takes up the extra $40 that the Trustee seeks for the plan payments.

the name of his daughter and her husband Henry Rosas because of Debtor's credit problems. In consequence, the GMAC bill is in the name of Theresa Rosas (exhibit 1), and the Allstate policy identifies Henry, Theresa and Tasha (daughter of Theresa) Rosas as the named insured. Exhibit 3. When the Cavalier has been paid for, Henry and Theresa will transfer the title to Debtor. The only other transportation available to the Debtor and his family is the 1980 Chevrolet pickup, which for years was used for, among other things, driving in and out of the forest and hauling wood. Based on those facts, the Court has assumed that the truck no longer provides dependable transportation, and in any event, it is not a safe vehicle for the transportation of four people at one time.

*DISCUSSION AND ANALYSIS*

Before addressing the standards for confirmation of a chapter 13 plan and the good faith issue generally, the Court will address specific aspects of the testimony and the objections raised by Mr. Dutchover and the Trustee.

To begin with, Mr. Gonzales is not a sophisticated (or articulate) debtor. He appears to have trouble reading. His wife apparently is the one in the family who writes the checks to pay the bills. And he is hard of hearing. But this is not to say Debtor is not intelligent. Indeed, just the opposite; Mr. Gonzales in his life and his testimony has made it apparent to this Court that he is quite intelligent and even somewhat wily.

Debtor testified that he did not receive "cash" payments for his work, and insisted that he had not testified (or admitted) anything to the contrary at the second session of his § 341 meeting. This was contrary to the implications of Mr. Rafkin's cross examination of the Debtor and to the testimony of Mr. Rafkin's legal assistant about the § 341 meeting which she attended and at which the Debtor testified. Mr. Rafkin stated that he was surprised that Debtor denied receiving cash payments from his son and that Debtor denied testifying otherwise at the § 341 meeting, and that was the reason that he offered no transcript of the § 341 meeting. Having heard the testimony from both witnesses, the Court concludes that both were credible. Without the benefit of a transcript, the Court concludes that part (or maybe all) of the problem arises from confusion about what was being asked and answered. Debtor insisted that he was always paid by check, even when employed by one of his sons. The questions at trial did not distinguish between payments by check and payments in the form of currency, although both types of payments are commonly referred to as "cash" payments. Thus the Court has no basis for finding that Debtor has been deceptive in his disclosures or his testimony.

Of more concern is Debtor's failure to list the Cavalier and the attendant obligations anywhere in his schedules or statement of affairs, except as "other" in Schedule J. However, to a debtor not versed in the all-encompassing reach of the definition of property of the estate under § 541 and the wide and multi-pronged scope of the questions by which the schedules and statement of affairs implement that definition, it might not be obvious that a car titled and insured in someone else's name should be listed as property of the debtor.[6]

6. In ruling on the (in)adequacy of the Debtor's disclosure of the payment and insurance arrangements for the Cavalier, the Court does not thereby intend to approve the unorthodox "strawman" nature of the arrangements. However, no one has raised an objection or suggested that anyone is getting hurt by that arrangement, least of all GMAC or the people of the State of New Mexico, and thus the

There was no testimony that Debtor was aware of the need to list these obligations and property interests but did not do so, intentionally or otherwise. Rather, opposing counsel merely relied on the absence of these items from the schedules and statement of affairs. For that reason, the Court finds that there has been no intentional or even reckless or negligent failure by Debtor to identify those. Indeed, Debtor did identify the obligation in his Schedule J, albeit obliquely. Practically speaking, what is clear in this case is that Debtor's counsel should have realized the implications of the Schedule J "other" entry and revised the schedules and advised Debtor accordingly. In fact, Debtor's counsel in closing argument candidly admitted that the failure to list the vehicle and the attendant debt was his fault. Thus, although the Trustee appropriately called attention to the deficiencies in the schedules, common sense dictates that Debtor not suffer for these deficiencies.

Under probing (but respectful) cross examination from Mr. Rafkin, Debtor was unable (or did not, in any event) specify the exact methodology he and his wife used to figure out their food budget. Debtor insisted they had "figured it out", and had not arrived at the number by guessing, although he said that he and his wife had not "consulted any receipts or any kind of ledger [they] keep to see how much [they] spend on food". Partial trial transcript, page 35, ll. 11–18 (doc 18) (hereinafter "Transcript"). Debtor's testimony was credible and the Court concludes that Debtor and his spouse exercised sufficient diligence in coming up with the figure for "food" on Schedule J.

The "food" item on Schedule J is budgeted at $700. Both Mr. Dutchover and the Trustee asserted that that figure was too large. That objection leads into a portion of the Code that has few bright-line standards.

> The statutory language of § 1325(b) provides little guidance as to the proper scope of inquiry of a bankruptcy court in its determination of whether particular budgeted expenses are reasonably necessary for the maintenance and support of the debtor or the debtor's dependents. The legislative history of § 1325(b) has been described as 'singularly vague and unenlightening'. *In re Jones,* 55 B.R. 462, 465 (Bankr.D.Minn. 1985).

*In re Stein,* 91 B.R. 796, 801 (Bankr. S.D.Ohio 1988). (Footnote omitted.)

 The legislative history makes it clear that Congress decided not to legislate specific budget numbers.

> Chapter 13 relief is essentially equitable, and contemplates a substantial effort by the debtor to pay his debts. Such an effort, by definition, may require some sacrifices by the debtor, and some alteration in prepetition consumption levels. Thus, the debtor might reasonably be required to devote to the plan that portion of his income which is not necessary for support of the debtor and his family. The courts may be expected to determine norms for such support, and Labor Department cost of living figures may provide some help. This approach will also permit plans to be confirmed where the debtor does make a substantial effort to pay his debts, even though the payment itself is not substantial.

S.Rep. No. 65, 98th Cong. 1st Sess. 22 (1983)(*quoted in In re Stein,* 91 B.R. at 801 n. 1 (Bankr.S.D.Ohio)). While Congress' decision was certainly reasonable, it inevitably leads parties and courts to apply their own standards as best they can. The Court has no reason to further consider the issue.

resulting methodology for making the decision is probably best described in the candid discussion of *In re Gonzales,* 157 B.R. 604, 607–08 (Bankr.E.D.Mich.1993) (footnote omitted):

> [T]he decision of whether a particular expense is reasonable is and ought to be based on the judge's own opinion, for the judge is, in § 1325(b)(2) decision-making, the hypothetical reasonable person. See *In re Sutliff,* 79 B.R. 151, 156 (Bankr.N.D.N.Y.1987) ("However, an inquiry into a debtor's 'reasonably necessary' expenses is unavoidably a judgment of values and lifestyles and close questions emerge."); *In re Rogers,* 65 B.R. 1018, 1021 (Bankr.E.D.Mich.1986) ("This question unavoidably involves the bankruptcy court in difficult value judgments.... It's an unpleasant job, but someone has to do it ... [T]he someone is the bankruptcy judge."); K. Lundin, 1 Chapter 13 Bankruptcy § 531, pp. 5–981–99 (Wiley Law Publications, 1992) (compiling and comparing cases) ("Determining reasonable necessary expenses drags the bankruptcy court into approving or disapproving of the debtor's lifestyle ...."); p. 5–98d ("The courts are struggling because the disposable income test inevitably involves bankruptcy judges in lifestyle decisions for Chapter 13 debtors.").

And one consequence of judges, and parties, establishing their own standards is a divergence of standards. "[T]he more subjective the decision, the less predictable the result. But when Congress leaves something to judicial discretion, it tolerates as a necessary evil the probability that similar cases may be decided differently." *Id.,* at 608 n. 3.

Vague standards at the ready, the Court considers what is a proper food budget in these circumstances. To begin with, the spirit of (at least mild) sacrifice called for by the legislative history is not a requirement for a reduction of prepetition spending in every case. Such would simply not be feasible where (as an example that is not the case here) the debtor's sole income was public assistance of less than $1,000 per month.

Another consideration is what it is that is comprehended by the term "food" in Schedule J. Obviously bananas and milk are "food". But what of toothpaste, aspirin, paper towels, hair care products, or make-up for a teenage girl? All of these items are sold at supermarkets and similar retailers throughout the country. There is no other category that these items remotely fit into.[7] What they illustrate is how an inquiry limited largely to how much teenage athletes eat really misses the large scope of non-food items that are routinely purchased and consumed by typical families.

All of that being said, there are a number of cases in which courts have ruled that specific budget items for food are too large. *See, e.g., In re Carlton,* 211 B.R. 468 (Bankr.W.D.N.Y.1997) (for two parents and their two teenage children, food budget of $850 was $300 too high; for two parents and four children, one or more of which children were attending college, food budget of $1,200 was $350 too high); *In re Williams,* 201 B.R. 579 (Bankr.M.D.Fla. 1996) (for single debtor with no dependents, $450 for food was excessive by $100); *In re Coburn,* 175 B.R. 400 (Bankr. D.Or.1994) (for two parents and three children, some of whom were athletes partici-

---

**7.** Presumably one could devise a fairly simple test to determine whether something falls into the "food" category or some other category on Schedule J, perhaps even using the model of a typical grade-school IQ test: "Circle the item in the following list that does not fit: Recreation, clubs and entertainment, newspapers, magazines, and toilet paper."

pating in sports programs, court allowed $650 per month for food rather than $773); *In re Stein*, 91 B.R. 796 ($780 food budget for two parents and three children aged 15, 13 and 11 was excessive by local standards).[8] Practically speaking, these cases provide little if any guidance to the Court in making this decision.

■ Debtor testified that the food budget of $700 per month would decrease, but not appreciably, for the four persons in the house now that Laura, a young adult grandchild, had moved out of the house. Of course, it is common knowledge that the reduction by 20% of the persons in the household does not result in a 20% decrease in the food budget for the remaining four. And there was no evidence that Debtor and his spouse did not historically spend the same amount as they have budgeted, which adds credibility to the Debtor's position. *In re Coburn*, 175 B.R. at 406. Given the physical labor that occupies Debtor, that Mildred Gonzales is probably on her feet almost all day, and that Gonzales and Reyna are teenagers, a $700 monthly food budget does not seem unreasonable. Indeed, the facts that the budget apparently did not significantly decrease with the departure of Laura, the relatively remote location of Ruidoso Downs from big population centers that feature competitively priced food retailers, and the question of whether this family even has the resources to make purchases in large enough quantities to save money, all raise the issue of whether even the $700 was a sufficient sum for food when the household included Laura as well. In consequence, the Court finds that the $700 budgeted for "food" is not excessive.

■ Debtor was also questioned about the fact that his son is 18, is not in school, and still resides with them, but appears not to be contributing significant income to the family. The granddaughter Reyna will soon be 18. And while Laura, another adult granddaughter, recently moved out, there is nothing to suggest that she might not move back in, or that another adult child might not move in as well, in the next five years. During closing argument, in a colloquy urged by the Court, the Trustee emphasized that she has never opposed the support of grandchildren or of young adult children who are in school, including college.[9] However, she also pointed out that Debtor had no legal obligation to support his majority-age son, and raised the example of Social Security payments that stop at 18 (if the child is not in school) as an indicator that adult children ought not to be included in a debtor parent's budget. She could have also pointed to examples from non-governmental entities, such as medical insurance coverage that stops at 18 or 21.

But the standards set by the Social Security administration or health care companies, whether for purposes of limiting outlays, administrative convenience or maximizing profit, or for any other reason, should not drive this Court to disregard the cultural and societal norms inherent in what are called, in this country, "extended" families.[10] While Ward and June

8. The examples illustrate why counsel did not bother to cite any specific cases on the subject. Trying to extrapolate what would be a reasonable food budget from southern Ohio in 1988 (*In re Stein*) to southern New Mexico in 2003 would be a pointless exercise.

9. At least one court has found it reasonable for debtor parents to support their young adult children in college. *In re Gonzales,* 157 B.R. at 607. Nothing in this decision is intended as an adjudication of that issue.

10. Black's Law Dictionary 620 (7th Ed.1999) defines an extended family as "[t]he immediate family together with the collateral relatives who make up a clan.". An "immediate

Cleaver and their two sons Wally and Beaver may represent for many people the "typical" or "normal" family, tens of millions (or more) of the population of this country live in family or household units that include one or more adult children and/or their children, (great)grandparents and (great)grandchildren, uncles and aunts, nieces and nephews, and cousins of various degrees of relationship, to say nothing of "blended" families (children from their parents' previous marriages brought together into one family), and families that foster a child or take in a neighbor child escaping a bad situation at home. Indeed, for much of the history of this country, the extended family was more common and traditional than the "nuclear" family.[11]

> The tradition of uncles, aunts, cousins, and especially grandparents sharing a household along with parents and children has roots equally venerable and equally deserving of constitutional recognition. Over the years millions of our citizens have grown up in just such an environment, and most, surely, have profited from it. Even if conditions of modern society have brought about a decline in extended family households, they have not erased the accumulated wisdom of civilization, gained over the centuries and honored throughout our history, that supports a larger conception of the family. Out of choice, necessity, or a sense of family responsibility, it has been common for close relatives to draw together and participate in the duties and the satisfactions of a common home.... Especially in times of adversity, such as the death of a spouse or economic need, the broader family has tended to come together for mutual sus-

tenance and to maintain or rebuild a secure home life.

*Moore v. City of East Cleveland, Ohio*, 431 U.S. 494, 504–05, 97 S.Ct. 1932, 52 L.Ed.2d 531 (1977)(footnotes omitted.)

While the Court is quite comfortable that the Trustee would never think of objecting to the support of any child under 18, or to the support of many of the persons of majority age in an extended family (for example, an ailing grandparent), the Trustee's argument in this case necessarily raises the issue of where the line should be drawn. And while the drawing of any line is subject to attempted abuse, this Court believes the line should be drawn far enough out to recognize and protect any genuine family unit.

In addition, the Court has interpreted Debtor's testimony as saying that Gonzales works when he can find work, but is involuntarily unemployed for significant periods of time.

Q: "I got the impression he works sometimes and not at others; is that right?

A: "Yes.

Q: "Where does he work when he does work?

A: "I don't know. With whoever he finds is looking for a job [sic]. He just doesn't work very much."

Transcript, page 58, ll. 4–9. This testimony is consistent with the reality of an area of the state (and in many ways, the state as a whole) in which steady or long-term employment at good wages is rare.

Finally, Ruidoso Downs, like virtually all the rest of the state, has little if any public transportation; access to a vehicle is a

---

family" is "[a] person's parents, spouse, children and siblings." *Id.*

**11.** A nuclear family is defined as "[a] family group that consists only of father, mother and children." Webster's Ninth New Collegiate Dictionary 809 (1991).

prerequisite for getting employment or doing anything else. So paying for a car and the requisite insurance to go with it is a necessity of life in that vicinity.

For the foregoing reasons, the Court rules that the mere fact of support of an adult child does not make a debtor's chapter 13 budget unreasonable. (And, to be clear, the Trustee has not argued otherwise.) The Court also finds in this case that Debtor's budget, and specifically his Schedule J expenditures, is "reasonably necessary ... for the maintenance or support of the debtor or a dependent of the debtor." § 1325(b)(2)(A).

There is little doubt that Mr. Dutchover's claim would or does constitute a nondischargeable debt. "Aggravated battery consists of the unlawful touching or application of force to the person of another with intent to injure that person or another." § 30–3–5 N.M. Stat. Ann. (1978). *See State v. Fuentes*, 119 N.M. 104, 888 P.2d 986 (Ct.App.1994) (repeatedly stabbing victim with a knife is comprehended by this statute). A jury presumably having made this finding beyond a reasonable doubt, the doctrine of collateral estoppel or issue preclusion, as permitted by *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) and *Brown v. Felsen*, 442 U.S. 127, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979) would result in a judgment meeting the standards of nondischargeability of § 523(a)(6). *Kawaauhau v. Geiger*, 523 U.S. 57, 118 S.Ct. 974, 140 L.Ed.2d 90 (1998). And this is so regardless of Debtor's assertion at this late date that he would have asserted a defense of self-defense at the criminal trial had his attorney permitted him to testify, and that his attorney in the civil case did not have his authority to consent to the entry of the civil judgment on his behalf.

Congress enacted the "super discharge" provisions of chapter 13 in part based on its finding that most creditors who obtain a nondischargeable judgment in connection with a chapter 7 case ultimately collected little or nothing from that judgment, and thus even those creditors would be better off with the receipt of some small sum of money from a chapter 13 which discharged the rest of the debt, rather than nothing at all. *See In re Lambert*, 10 B.R. 223, 227 (Bankr.E.D.N.Y.1981) (26% payment on an otherwise nondischargeable claim better than nothing at all). In this proceeding, the testimony made clear that for almost a decade after the filing of the civil suit, and for more than three years after the entry of the civil judgment, Mr. Dutchover had collected nothing. Given Debtor's age (62) and his varying sources of income, and the fact that social security income is immune from garnishment for this sort of debt, 42 U.S.C. § 407(a), the likelihood of Mr. Dutchover collecting anything is rapidly diminishing. (And this calculation does not take into account the cost to Mr. Dutchover of his collection efforts.) In consequence, these circumstances are exactly those contemplated by the statute, and call for confirming the plan, unless there are other reasons not to do so. *See, e.g., Mason v. Young (In re Young)*, 237 B.R. 791 (10th Cir.BAP1999) (de minimis payment plan, amended from a 36–month plan to a 60–month plan, discharged $300,000 punitive damages for civil-rights and unlawful-discharge torts); *In re Gillespie*, 266 B.R. 721, 724 (Bankr.N.D.Iowa 2001) (chapter 13 plan confirmed including claim for $33,000 arising out of conviction for assault with intent to inflict serious injury); *but compare Gier v. Farmers State Bank of Lucas, Kansas*, 986 F.2d 1326 (10th Cir.1993) (although "the Code permits serial filings under Chapter 7 and Chapter 13 and ... such filings therefore are not per se evidence of bad faith", the bankruptcy court was not clearly erroneous in finding bad faith concerning the

attempt to discharge a claim for cattle conversion).

■ In *Flygare v. Boulden*, 709 F.2d 1344 (10th Cir.1983), the Tenth Circuit set out a non-exhaustive list of eleven factors to consider in making the decision about whether a plan is filed in good faith.

We adopt the factors the Eighth Circuit listed as relevant to a determination of good faith. We reproduce them here for guidance on remand:

"(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increases in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is non-dischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief; and

(11) the burden which the plan's administration would place upon the trustee."

This list is not exhaustive, and the weight given each factor will necessarily vary with the facts and circumstances of each case.

*Id.*, at 1347–48 (citation omitted).

■ The *Flygare* factors apply to this case as follows: The Debtor has a relatively small surplus of $87 (in addition to $50 for recreation and $50 for cable, although in that location in the state there is little television reception without cable) and $85 of the $87 is being paid to creditors. The debtor is 62 and likely to earn less rather than more as the years go by; and at least in recent years he has not held any high paying jobs. The duration of the plan was increased from 36 to 60 months. Other than the inaccuracies concerning the car being purchased by and for Debtor and his family by his daughter Terry and her husband, the schedules and statement of affairs appear accurate; the discrepancies concerning the Cavalier do not appear to be the fault of the Debtor and were not in any event part of an attempt to mislead the Court, the Trustee or the creditors. Given that Mr. Dutchover's claim is the only non-administrative debt being paid, there is no discrimination among claims. No secured claims are being modified. Mr. Dutchover's claim would almost certainly be nondischargeable in a chapter 7 case.[12] Neither Debtor nor anyone in his family has suffered an unanticipated medical situation or been subject to any similar special circumstances. Debtor and his spouse initially filed for and received chapter 7 relief in 2002; the amount of debt sought to be discharged in that case was

12. It appears that Mr. Dutchover's claim is nondischargeable only as to Debtor; there has been no assertion that it was incurred for the benefit of the community. *See Naranjo v. Paull,* 111 N.M. 165, 177, 803 P.2d 254, 266 (Ct.App.1990); Section 40–3–9(A)(5) NMSA 1978 (1999 Repl.)(defining separate tort). In any event, no nondischargeability action was filed against Mildred Gonzales during the chapter 7 case.

about $49,000, of which $36,000 was Mr. Dutchover's claim. Debtor's motivation and sincerity is clear; the consequences of the fight with Mr. Dutchover have been hanging over Debtor almost a decade, including the more than two years that he spent in prison for the crime,[13] and he is now 62 years old and wanting to move on in his life. Finally, the plan imposes no administrative burden on the Trustee beyond the minimum imposed any other plan; namely, to receive the Debtor's monthly payment, deduct her fee, distribute the rest to counsel and then to Mr. Dutchover, and to keep track of these payments and distributions.

In addition, the Court finds that the Debtor's plan is feasible, although with the passage of time it will likely be harder for Debtor to make all his promised payments timely. The plan also meets the requirements of § 1325(a) and (b).

An additional finding or comment is compelled by the facts of this case. In making the finding and conclusion that Debtor needs to be able to move on with his life, the Court does not in any way intend to minimize the suffering of Mr. Dutchover. He is the one who was truly the victim in the fight, and the passage of time certainly weighs no less heavily on him than on the Debtor.

*SUMMARY AND DISPOSITION*

In summary, Debtor meets virtually all the tests set out by the Tenth Circuit in *Flygare*. Given the policy decisions made by Congress when it enacted chapter 13 of the Code, the Court finds that the Debtor's chapter 13 plan as orally amended during trial has been filed in good faith, and is otherwise confirmable. Any other objections are overruled.

13. In closing argument Debtor suggested the Court take into account the prison sentence he served. Debtor's prison sentence was in answer to the people of New Mexico for his

IT IS THEREFORE ORDERED that the Debtor's chapter 13 plan, filed January 16, 2003 (doc 3), as orally amended at trial to extend it to sixty (60) months, is confirmed.

public delict; the civil judgment and the consequences thereof, including this chapter 13 case, are part of the answer to Mr. Dutchover for Debtor's private delict.